**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 23, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LUIS ALBERTO CARDINAS
GARCIA,

Defendant-Appellant.

No. 08-5090

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. CR-07-150-GKF)**

---

Bill Zuhdi, Bill Zuhdi Attorney at Law, P.C., Oklahoma City, Oklahoma, for
Appellant.

Leena Alam, Assistant United States Attorney (David E. O'Meilia, United States
Attorney, with her on the brief), Office of the United States Attorney, Northern
District of Oklahoma, Tulsa, Oklahoma, for Appellee.

---

Before **TACHA**, Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and
**TYMKOVICH**, Circuit Judge.

---

**TYMKOVICH**, Circuit Judge.

---

A federal jury convicted Luis Alberto Cardinas Garcia (Cardinas)[1] of one count of possessing 500 grams or more of a mixture containing methamphetamine with intent to distribute, a violation of 21 U.S.C. § 841. He was sentenced to 151 months' imprisonment.

On appeal, Cardinas raises three issues. *First*, he claims the evidence presented at trial was insufficient to convict him. To support this claim, he argues we should ignore two key pieces of evidence presented by the prosecution: (1) the testimony of a government witness, which he asserts was inherently incredible; and (2) testimony from a police officer who saw Cardinas sell methamphetamine and cocaine to a confidential informant a month before committing the present offense. *Second*, Cardinas claims the jury verdict form used at his trial improperly led the jurors to believe he was required to prove his innocence beyond a reasonable doubt. He asserts this was prejudicial error because the jury reached an impasse after its first deliberation session and did not return a guilty verdict until the following day. *Third*, he claims cumulative error warrants reversal.

We conclude that sufficient evidence supports the conviction and that any imperfection in the jury verdict form did not prejudice Cardinas. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm his conviction.

---

[1] Though the parties referred to the defendant by the name Garcia in their briefs and at oral argument, he stated at trial he prefers the name Cardinas. We therefore use that name throughout this opinion.

# I. Background

## A. The May Drug Sale and the Suspected Stash House

In May 2007, as part of an investigation of drug-related activity in Tulsa, Oklahoma, a special investigator from the Tulsa Police Department observed Cardinas sell a package containing methamphetamine and cocaine to a confidential informant. After Cardinas left the site of the drug sale in his Ford Explorer, another Tulsa police officer stopped him for speeding. The officer used a drug-sniffing dog to search Cardinas's car, but found nothing and let Cardinas go with a ticket for driving without a license. Because the investigation was ongoing, the special investigator decided not to pursue charges against Cardinas for the drug sale and instead had the drugs destroyed.

Cardinas remained a target. He frequently visited a suspected "stash house"—a location where a drug dealer stores his drugs—that was under surveillance by the Tulsa police. The particular stash house was an apartment rented by Cardinas's friend Isaias Gonzales.

During Cardinas's visits, he would repeatedly exit Gonzales's apartment, meet various people in the parking lot, then return to the apartment. This regular pattern of behavior suggested to the investigator that Cardinas was dealing drugs.

## B. The June Drug Bust

On the night of June 12, 2007, a Tulsa police sergeant and an agent from the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), conducted a

surveillance operation at Gonzales's apartment, suspecting it was being used to facilitate drug dealing. Their investigation was separate from that of the Tulsa special investigator's, and they were apparently unaware of Cardinas's May drug sale and frequent visits to the apartment.

During the surveillance, the police sergeant and ATF agent observed "short-term foot traffic": three or four people separately entered Gonzales's apartment, stayed for a brief time, then left. R. Vol. 2 at 17, 26–27. This foot traffic corroborated the sergeant and agent's suspicions of drug activity, and they decided to confront the occupants of the apartment.

When the sergeant and ATF agent approached the apartment, they encountered Cardinas as he was leaving. They asked him whether the apartment was his; he answered no, and they patted him down for drugs and weapons. Finding nothing, the sergeant and agent proceeded to knock on Gonzales's door and obtain permission to enter and search his apartment. Cardinas remained at the scene while the officers conducted their search.

During their search, the sergeant and ATF agent found nearly two pounds of methamphetamine packaged in numerous plastic bags, as well as a set of digital scales commonly used to weigh quantities of drugs. Upon finding this evidence, they arrested Gonzales, and he proceeded to tell the sergeant and ATF agent he received the drugs and scales from a man named Tony. Gonzales claimed he had planned to sell the drugs and pay Tony with the proceeds. Based

-4-

on this information, the sergeant and ATF agent allowed Cardinas and several other men who were present in the apartment to leave. At the time, the sergeant and ATF agent did not suspect Cardinas played a role in the possession or distribution of the seized methamphetamine.

Later that night, the police sergeant communicated with the Tulsa special investigator who had previously surveilled Cardinas. The sergeant found out for the first time that the special investigator had already obtained a warrant to search Cardinas's own apartment based on information the special investigator had gathered over the previous two months. The sergeant informed the special investigator of Gonzales's arrest and Cardinas's presence at the stash house that evening, and the Tulsa police executed the search warrant early the next morning, on June 13, 2007.

The police did not find any drugs or drug paraphernalia at Cardinas's apartment. They did, however, find a large amount of cash.[2] Cardinas was later charged with possession, with intent to distribute, the drugs found at Gonzales's apartment.

### C. Gonzales's Plea Agreement

When Gonzales was initially arrested, he erroneously believed he would not be sent to jail for possessing the methamphetamine found at his apartment.

---

[2] At trial, Cardinas disputed the amount of money the police officers found during their search of his apartment. The officers claimed they found $1,700; Cardinas asserted they found only $1,000.

Instead, he was under the impression he would be deported to Mexico. Later, upon learning he could be sentenced to significant jail time, Gonzales changed his story about the origin of the drugs.

At a conference to discuss the possibility of a plea agreement, Gonzales admitted to prosecutors he had lied about receiving the methamphetamine from Tony. He stated he had fabricated the name Tony and had actually received the drugs from Cardinas. He claimed Cardinas was planning to sell the drugs and had promised to pay Gonzales $2,000 to hold them. After agreeing to testify truthfully regarding Cardinas's ownership of the drugs, Gonzales executed a plea agreement, pursuant to which the government promised to recommend a lighter sentence to Gonzales's sentencing judge.

### D. Cardinas's Trial

Shortly before Cardinas's trial, the government filed a notice pursuant to Federal Rule of Evidence 404(b) announcing its intention to introduce testimony regarding Cardinas's May 2007 drug sale. The government asserted the testimony would establish Cardinas's "motive, opportunity, intent, preparation, plan, knowledge, identity, . . . absence of mistake or accident and his consciousness of guilt." R. Vol. 1, Doc. 28 at 3. In response, Cardinas's counsel filed a motion in limine to exclude the testimony, arguing it would cause a distracting "minitrial," would be "burdensome and a confusion of the issues[,] . . . and [would] result in

unfair prejudice." R. Vol. 1, Doc. 29 at 5. The district court denied the motion in limine and the case proceeded to trial.

At trial, the government offered testimony from various witnesses including the ATF agent, Gonzales, the special investigator who had surveilled Cardinas during the May drug sale, and a forensic scientist who testified that the drugs seized at Gonzales's apartment were indeed methamphetamine. Cardinas's counsel reasserted his Rule 404(b) objection to the special investigator's testimony, but the court overruled the objection and admitted the testimony with a limiting instruction.

During the government's case-in-chief, Cardinas's counsel thoroughly cross-examined Gonzales. The cross-examination emphasized that Gonzales had initially lied to police regarding the origin of the methamphetamine. Gonzales also admitted he had sold some of the methamphetamine to pay his rent. Finally, Gonzales admitted he decided to testify against Cardinas only after learning he could be sentenced to a significant jail term for possessing methamphetamine, and only after executing a plea agreement with the government.

During the defense's rebuttal, Cardinas took the stand to describe his relationship with Gonzales and rebut Gonzales's testimony. Cardinas testified that he and Gonzales are Mexican citizens and came to the United States illegally. They grew up in the same hometown in Mexico and became friends in Tulsa because of their shared history. Cardinas claimed he helped Gonzales move into

the apartment where the methamphetamine was found, had sold Gonzales some furniture and a sound system, and visited Gonzales's apartment once or twice a week merely to trade movies.

With respect to the May 2007 drug sale, Cardinas explained he did not actually sell the drugs to the confidential informant but was merely a one-time middleman. Cardinas explained that over the course of a month, the confidential informant (who was Cardinas's work colleague) had asked every day for help in obtaining drugs and kept "insisting and insisting" that Cardinas help him. R. Vol. 2 at 191–2. Cardinas testified he finally relented, obtained the drugs, and delivered the drugs to his friend while under surveillance by the Tulsa special investigator. Cardinas claimed he had never sold, or helped anyone obtain, drugs before that day.

As for the June drug bust, Cardinas explained he was present at Gonzales's apartment that night merely to pick up money from Gonzales for the furniture Cardinas had sold him. Cardinas claimed he had entered Gonzales's apartment, picked up the money, and less than five minutes later had left the apartment when he encountered the Tulsa police sergeant and the ATF agent. Cardinas testified he had nothing to do with the drugs or scales seized at Gonzales's apartment and had never seen them prior to that night.

Finally, Cardinas claimed that after he and Gonzales were arrested, while they shared a holding cell, Gonzales revealed to him the true source of the

methamphetamine and digital scales the police found at Gonzales's apartment. According to Cardinas, Gonzales said the drugs belonged to a man named Esteban Contreras.

### E.    Jury Deliberations

At the close of Cardinas's case, the court held a conference to finalize the jury instructions. After addressing the parties' various concerns—and discussing whether the proposed instructions properly described the burden of proof—the court asked whether Cardinas's counsel had any final objections. He stated he did not. At no time during the conference did either party object to the jury verdict form.

The court then called the jury, read the instructions, and allowed the parties to make closing arguments. After approximately four hours of deliberation, the jury sent a note to the trial judge stating that the jurors had not yet reached a "unanimous agreement" and "seem[ed] to be at an impasse." R. Vol. 2 at 275. The note stated that one juror needed to pick up a child from day care and could not continue deliberating, and the jury sought guidance on how to proceed given the time constraints. At a conference with the parties' attorneys, the court noted that the jury had not been deliberating long and, after confirming with the parties the appropriate course of action, dismissed the jury for the day.

The next day, the jury deliberated for approximately one and a half hours and returned a unanimous guilty verdict.

## II. Discussion

Cardinas raises three issues on appeal. *First*, he claims we should disregard two key pieces of evidence admitted at trial, and then conclude the evidence was insufficient to sustain his conviction. Cardinas contends Gonzales's testimony—which was the only evidence directly linking Cardinas to the methamphetamine found at the stash house—was "inherently incredible," and we should ignore it. He also urges us to ignore the testimony of the Tulsa special investigator regarding the May 2007 drug sale, claiming the testimony was improperly admitted under Rule of Evidence 404(b).

*Second*, Cardinas claims the jury verdict form improperly shifted the burden of proof by suggesting he was required to prove his innocence beyond a reasonable doubt. He argues the verdict form was important to the jury's deliberative process, and the error warrants a new trial. In particular, he asserts the record shows the error on the verdict form was not harmless, because the jurors came to an impasse at the end of their first deliberation session and did not return a guilty verdict until the next day.

*Third*, Cardinas claims cumulative error warrants reversal of his conviction. We address each of these contentions in turn.

### A.   Sufficiency of the Evidence

We review Cardinas's sufficiency of the evidence claim de novo, viewing the evidence as a whole and in the light most favorable to the government.

*United States v. Parker*, 553 F.3d 1309, 1316 (2009). Furthermore, our review is deferential to the jury's fact-finding, and we must sustain Cardinas's conviction if any rational juror could have found him guilty. *Id*.

In the context of sufficiency of the evidence claims, we normally do not revisit factual issues that are the exclusive province of the jury. We accept at face value the jury's credibility determinations and its balancing of conflicting evidence. *Id*. Indeed, we will overturn a jury's credibility determination and disregard a witness's testimony only if the testimony is inherently incredible— that is, only if the events recounted by the witness were impossible "under the laws of nature" or the witness "physically could not have possibly observed" the events at issue. *United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001) (quoting *Tapia v. Tansy*, 926 F.2d 1554, 1562 (10th Cir. 1991)).

To convict a defendant for possession of illegal drugs with intent to distribute, a jury must find, beyond a reasonable doubt, that the defendant (1) knowingly possessed the drugs and (2) had the specific intent to distribute them. *United States v. Lauder*, 409 F.3d 1254, 1259 (2005). But the government need not prove the defendant actually possessed the drugs at the time he was arrested; a conviction may be based on constructive possession. *Id*. To prove constructive possession, the government must present evidence establishing "some nexus, link, or other connection between the defendant and the contraband." *Id*. (citing *United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994)). If the evidence

"supports at least a plausible inference that the defendant had knowledge of and access to the contraband," it is sufficient to prove constructive possession. *Id*. (alteration omitted) (quoting *United States v. Norman*, 388 F.3d 1337, 1341 (10th Cir. 2004)).

If it were proper for the jury to credit Gonzales's testimony and the government's Rule 404(b) evidence, there is no question Cardinas's conviction was supported by sufficient evidence. The evidence showed Cardinas had access to Gonzales's apartment and the methamphetamine stored there: the Tulsa special investigator saw him coming and going from Gonzales's apartment three or more times per week over the course of two months. Furthermore, Cardinas was present at the apartment the night of the June drug bust, and Gonzales himself testified Cardinas was the owner of the drugs and planned to sell them. Finally, the drugs were packaged in small plastic bags and a digital scale was found with them; these facts, along with Cardinas's May drug sale, suggest Cardinas had the specific intent to distribute the drugs. In sum, viewed in its entirety, and with inferences drawn in favor of the government, the record contains sufficient evidence to sustain Cardinas's conviction. *Cf. Lauder*, 409 F.3d at 1260 (finding that the evidence was sufficient to prove a transient occupant of a house had constructive possession of, and intent to distribute, drugs stored in the house).

But Cardinas argues we may not credit Gonzales's testimony or the government's Rule 404(b) evidence. He asserts the only admissible evidence

linking him to the drugs was the ATF agent's testimony that Cardinas was present at Gonzales's apartment on the night of the drug bust. "Mere presence," Cardinas argues, "is not enough for a conviction." Aplt. Br. at 25. Thus, we must consider Cardinas's objections to Gonzales's testimony and his objections to the government's Rule 404(b) evidence.

### *1.     Gonzales's Testimony*

We reject Cardinas's argument regarding the credibility of Gonzales's testimony. Cardinas asserts that because Gonzales initially lied to the police about the origin of the drugs, and failed to explain at trial why he did so, his testimony was inherently incredible. But this assertion does not come close to establishing "inherent incredibility" under our case law.

As an initial matter, the record reveals a perfectly rational explanation for Gonzales's change of story. When Gonzales was arrested, he erroneously believed he would not spend time in jail for possession of the methamphetamine, but would only be deported. At the time, Gonzales might have figured that given his light punishment, he could gain nothing by telling the truth. Indeed, Gonzales testified during direct examination that he fabricated the story about Tony to protect his longtime friend Cardinas.

But Gonzales later learned he faced significant potential jail time for possession of methamphetamine. With this knowledge, Gonzales might have perceived he could gain something quite valuable by telling the truth: leniency

with the prosecutors and the possibility of a reduced sentence. Indeed, this is exactly what Gonzales received in his plea agreement.

Given this explanation of the shifting testimony, the mere fact that Gonzales failed at trial to explain his reasons for changing his story does not make his testimony inherently incredible. Furthermore, during cross-examination Cardinas's counsel was able to reveal the inconsistencies in Gonzales's testimony and his motive for implicating Cardinas (i.e., favorable treatment from the government). The jury thus had before it all facts relevant to Gonzales's credibility. In this context, the jury acted within "the bounds of reason" when it credited Gonzales's testimony despite the inconsistencies. *See Oliver*, 278 F.3d at 1043.

Moreover, the doctrine of inherent incredibility is a longshot. A fact-finder's credibility determinations are "virtually unreviewable on appeal." *United States v. Virgen-Chavarin*, 350 F.3d 1122, 1134 (10th Cir. 2003) (quoting *United States v. Jones*, 160 F.3d 473, 480 (8th Cir. 1998)). Cardinas's arguments simply fail to overcome the stringent standards of the inherent incredibility doctrine.

Cardinas relies on our decision in *Tapia* but does not explain why Gonzales's story described events that he "physically could not have possibly observed" or events that "could not have occurred under the laws of nature." *Oliver*, 278 F.3d at 1043 (quoting *Tapia*, 926 F.2d at 1562); *see United States v. Williams*, 216 F.3d 611, 614 (7th Cir. 2000) ("Because Williams has failed to

-14-

allege any such special circumstances here, his challenge to the sufficiency of the evidence is without merit.").

In *Tapia*, we were not confronted with a situation where the witness claimed to be in two different places at the same time or made other claims contrary to the "laws of nature." Rather, there—as here—the witnesses' testimony presented two distinct versions of the historical facts. In these situations, we have held that the testimony of a drug dealer's compatriots, regardless of whether the testimony is "confused" or "self-contradicting," is not inherently incredible. *See Lauder*, 409 F.3d at 1259–60; *see also Williams*, 216 F.3d at 614 ("We must leave open the possibility that even a liar tells the truth once in a while, and the jury is in the best position to judge [a witness's] credibility."). Given the reality of these types of prosecutions, juries frequently hear conflicting testimony pitting the word of co-conspirators against each other.

Nor does Cardinas explain why Gonzales "physically could not have possibly observed" the events he recounted. *Oliver*, 278 F.3d at 1043 (quoting *Tapia*, 926 F.2d at 1562). Gonzales lived at the stash house that Cardinas frequently visited and out of which Cardinas allegedly dealt drugs. Nothing impeded Gonzales's ability to observe Cardinas's actions—the observations he recounted at trial were of the type any co-conspirator would experience. *See id.* Despite Cardinas's insistence that Gonzales's waffling made his testimony inherently incredible, conflicting versions of facts are precisely within the

-15-

province of the jury to resolve and nothing in this case takes the testimony outside of the jury's realm. *See Tapia*, 926 F.2d at 1562 ("Nor does the fact that there are several conflicting versions [of the facts] affect our determination of credibility as a matter of law."); *cf. United States v. Smith*, 308 F.3d 726, 746 (7th Cir. 2002) ("Deference to the finder of fact, with the opportunity to observe the witnesses, supports credibility findings even in the face of some internal conflicts [in the witnesses' testimony].").

As a final point, it is worth noting that the jury was instructed that it need not believe Gonzales. Indeed, it was told that "You should receive this type of testimony with caution and weigh it with great care" since it is the product of a "plea agreement with Mr. Gonzales, providing a possible recommendation of a lesser sentence than he would otherwise likely receive." R. Vol. 1, Doc. 38 at 15 (Jury Instruction No. 11).

Thus, because Gonzales had a rational reason for changing his story regarding the origin of the methamphetamine, and because Cardinas's inherent incredibility arguments fail under our case law, we see no reason to set aside the jury's verdict under a sufficiency of the evidence challenge.

### 2. *Rule 404(b) Evidence*

Gonzales's testimony, if believed, is sufficient on its own to sustain Cardinas's conviction. The testimony was direct evidence of Cardinas's ownership of the drugs and his intent to distribute them. *See* 16 *McCormick on*

*Evidence* § 185 (6th ed. 2006) ("Direct evidence is evidence which, if believed, resolves a matter in issue."); *see also id.* (testimony from an eyewitness who saw the defendant commit the crime is direct evidence of the defendant's guilt). Nonetheless, the Rule 404(b) evidence—i.e., the Tulsa special investigator's testimony regarding the May 2007 drug sale—was important to the government's case. The evidence corroborated Gonzales's testimony and circumstantially proved Cardinas intended to distribute the nearly two pounds of drugs found at Gonzales's apartment. We therefore proceed to determine whether the district court properly admitted the evidence under Rule 404(b).

We will not reverse a district court's decision to admit Rule 404(b) evidence unless the decision was an abuse of discretion. *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006). If the decision "falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious, or whimsical," we must uphold it. *Id.* (internal quotation marks and bracket omitted) (quoting *United States v. Shumway*, 112 F.3d 1413, 1419 (10th Cir. 1997)).

Federal Rule of Evidence 404(b) provides, in relevant part:

> **Other Crimes, Wrongs, or Acts.**—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of . . . intent, . . . plan, knowledge, . . . or absence of mistake or accident.

To admit evidence of "other acts" under Rule 404(b), a court must make a four-factor inquiry: "(1) whether the evidence is offered for a proper purpose, (2) its relevancy, (3) that the probative value of the evidence is not substantially outweighed by its prejudicial effect, and (4) a limiting instruction is given if the defendant so requests." *Mares*, 441 F.3d at 1156. Cardinas challenges each of the four elements as they relate to the May 2007 drug sale. We find no merit in his arguments.

*One*, the evidence was offered for a proper purpose: to prove Cardinas's specific intent to distribute the drugs found in Gonzales's apartment. *See United States v. Becker*, 230 F.3d 1224, 1232 (10th Cir. 2000) (holding that a defendant's prior involvement with drugs may be admitted to show his intent for a drug trafficking charge). Furthermore, the May 2007 drug sale was admissible to corroborate Gonzales's testimony that Cardinas intended to distribute the drugs. *See United States v. Edwards*, 540 F.3d 1156, 1163 (10th Cir. 2008) (citing *United States v. Porter*, 881 F.2d 878, 886 & n.8 (10th Cir. 1989)), *cert. denied*, 129 S. Ct. 964 (2009). The evidence was therefore offered for a proper purpose under Rule 404(b).[3]

---

[3] Cardinas asserts the government's Rule 404(b) notice was inadequate because it contained only the boilerplate, scattershot argument that the May 2007 drug sale was admissible to prove Cardinas's "motive, opportunity, intent, preparation, plan, knowledge, identity, . . . absence of mistake or accident and his consciousness of guilt." R. Vol. 1, Doc. 28 at 3. While in the past we have expressed reservations with this scattershot approach because it fails to

(continued...)

*Two*, the evidence was relevant. To determine relevance under Rule 404(b), we must examine factors such as the similarity of the uncharged act to the charged conduct and the temporal proximity of the two acts. *See Mares*, 441 F.3d at 1158; *Becker*, 230 F.3d at 1232. Here, Cardinas's prior uncharged act (distribution of cocaine and methamphetamine) was quite similar to the charged crime (possession of methamphetamine with intent to distribute) and occurred only a month before the June drug bust. Therefore, given its probative force, the May drug sale was relevant under Rule 404(b). *See United States v. Cherry*, 433 F.3d 698, 702 & n.4 (10th Cir. 2005) (holding that testimony regarding the defendant's prior conviction for knowing distribution of crack cocaine, which occurred five years before the charged conduct, was relevant to prove intent to distribute crack); *see also Mares*, 441 F.3d at 1159 (a subsequent act of marijuana trafficking, which occurred nearly one year after the charged conduct, was relevant to show knowledge and plan).

*Three*, the probative value of the May 2007 drug sale was not substantially outweighed by its prejudicial effect. "More often than not, intent is proved by circumstantial evidence." *See United States v. Nickl*, 427 F.3d 1286, 1300 (10th

---

[3](...continued)
adequately frame the issue for opposing counsel and the court, *see Edwards*, 540 F.3d at 1163, in this case it was clear the government's Rule 404(b) evidence was offered for the proper purpose of proving Cardinas's intent. Furthermore, Cardinas's complaints about the government's Rule 404(b) notice are new; he failed to raise this argument to the district court.

Cir. 2005). Though evidence of the May 2007 drug sale was "prejudicial" to Cardinas in that it circumstantially established his intent to distribute the methamphetamine found in Gonzales's apartment, "such is the nature of evidence establishing an element of the charged crime." *Mares*, 441 F.3d at 1159. Here, the Rule 404(b) evidence was not *unfairly* prejudicial and the district court did not abuse its discretion in admitting the evidence.

*Four*, the district court, at Cardinas's request, gave a limiting instruction. Though Cardinas now claims the instruction was "inadequate," he does not explain why; nor did he object to the instruction when it was given at trial. In fact, the instruction told the jury it could credit the testimony "for no other purpose" than Cardinas's "motive, opportunity, intent" and the like. R. Vol. 1, Doc. 37 at 24 (Jury Instruction No. 20). We presume jurors will "conscientiously follow the trial court's instructions," and we see no reason to depart from that presumption here. *Cherry*, 433 F.3d at 702 (quoting *United States v. Carter*, 973 F.2d 1509, 1513 (10th Cir. 1992)).

In sum, the four prongs of the Rule 404(b) test were satisfied in this case. The district court did not abuse its discretion in admitting evidence regarding Cardinas's May 2007 drug sale to prove his intent to distribute the methamphetamine at issue.

*    *    *

To conclude, Gonzales's testimony—as well as the Rule 404(b)

evidence—properly enter our sufficiency of the evidence calculus, and we reject

Cardinas's sufficiency of the evidence claim.

### B.     The Verdict Form

Cardinas next claims that an error on his jury verdict form was prejudicial

and requires reversal.  He concedes, however, that at trial he failed to object to

the verdict form before the jury retired for deliberations.  *See* Fed. R. Crim. P.

30(d).  We therefore review Cardinas's claim for plain error only, *see* Fed. R.

Crim. P. 52(b), and will reverse his conviction only if (1) there was error, (2) that

was plain, which (3) affected Cardinas's substantial rights, and which (4)

seriously affected the fairness, integrity, or public reputation of the judicial

proceedings below.  *See United States v. Pursley*, 474 F.3d 757, 769 (10th Cir.

2007); *see also United States v. LaVallee*, 439 F.3d 670, 684 (10th Cir. 2006).

Cardinas's verdict form stated:

> We, the jury, duly impaneled and sworn in the above case,
> unanimously *find beyond a reasonable doubt* as follows as
> to the Indictment:
>
> On or about June 12, 2007, in the Northern District of
> Oklahoma, defendant, Luis Alberto Cardinas Garcia, did
> knowingly and intentionally possess with the intent to
> distribute 500 grams or more of a  mixture and substance
> containing a detectable amount of methamphetamine, in
> violation of Title 21, United States Code, Sections
> 841(a)(1) and (b)(1)(A)(viii).
>
> <u>Not Guilty</u>    __            <u>Guilty</u>    __

R. Vol. 1, Doc. 38 at 1 (emphasis added). Cardinas argues the language in the opening statement of the verdict form "erroneously shifted the burden of proof" by implying Cardinas was required to prove his *innocence* beyond a reasonable doubt and by failing to make clear that only the government carried the burden of proof regarding his *guilt*. Aplt. Br. at 20. He asserts the error on the form was harmful and requires reversal.

When reviewing a jury verdict form, we must determine whether it, along with the instructions read to the jury, as a whole adequately stated the applicable law. *See United States v. Stiger*, 413 F.3d 1185, 1190 (10th Cir. 2005). The verdict form tendered here suggests that regardless of the jury's verdict, the reasonable doubt standard had to be satisfied, implying that the jury could not acquit Cardinas unless it found him *not* guilty "beyond a reasonable doubt." Of course, due process requires the government to bear the burden of proof, not the defendant. *See Apprendi v. New Jersey*, 530 U.S. 466, 477–78 (2000). The verdict form should have been differently worded.[4]

But even so, any error on the verdict form does not require reversal. We look to the jury instructions as a whole, and, in that light we are satisfied the jury

_____

[4] The jury verdict form should be modified to correct any confusion in future cases. *See United States v. Bustos*, 303 F. App'x 656, 663 (10th Cir. 2008) (reviewing same verdict form and concluding it could "have been better constructed to eliminate any question . . . that the applicable standard of reasonable doubt and burden of proof might somehow be applied to a finding of 'not guilty,' rather than only to a finding of 'guilty.'").

was not misled about the government's burden of proving guilt beyond a reasonable doubt. Cardinas therefore fails to overcome the third prong of the plain error standard—whether the error affected his substantial rights. *See United States v. Zapata*, 546 F.3d 1179, 1190–91 (10th Cir. 2008), *cert. denied*, 129 S. Ct. 772 (2008).

Throughout the jury instructions, the district court consistently emphasized that the burden of proof was upon the government. For example, the first jury instruction stated: "The defendant pleaded not guilty and is presumed innocent. He may not be found guilty by you unless all twelve of you unanimously find that the government has proved his guilt beyond a reasonable doubt." R. Vol. 1, Doc. 37 at 2. Another instruction stated: "Remember at all times, you are judges—judges of the facts. You must decide whether the government has proved the defendant guilty beyond a reasonable doubt." *Id*. at 28 (Jury Instruction No. 24). Yet another stated "The government has the burden of proving a defendant guilty beyond a reasonable doubt. *The law does not require a defendant to prove his innocence or produce any evidence at all*." *Id*. at 8 (Jury Instruction No. 4) (emphasis added). The judge finally instructed the jury: "I remind you that it is your job to decide whether the government has proved the guilt of the defendant beyond a reasonable doubt." *Id*. at 12 (Jury Instruction No. 8).

Indeed, aside from the verdict form, Cardinas points to no other portion of the jury instructions that suggests confusion regarding the burden of proof. We

have previously held that a single, minor error in a set of jury instructions regarding the burden of proof does not mislead a jury when the instructions as a whole make the burden clear.  *See United States v. Martinez*, 776 F.2d 1481, 1484 (10th Cir. 1985).  Likewise, here it is unlikely that the wording of the jury verdict form affected the outcome of Cardinas's trial.[5]

Cardinas disagrees, arguing the jury "wrestled with coming to a verdict" and reached an "impasse" after four hours of deliberation.  Aplt. Br. at 42–43.  According to Cardinas, the jury's behavior proves that a different verdict form would have resulted in acquittal.  But nothing in the record suggests the jury's impasse was caused by confusion regarding the verdict form or jury instructions.  Instead, the record shows that a mere scheduling issue—specifically, a juror had to pick up a child from day care—necessitated the jury's adjourning for the evening before reaching a verdict.  Moreover, after the jury rendered its verdict, Cardinas asked the court to poll the jurors, and each unequivocally stated Cardinas was guilty.  Whatever "impasse" the jury had faced, it dissipated the next day when the jury reached its verdict.

---

[5] Several unpublished opinions from this circuit and others support this conclusion.  *See United States v. Bustos*, 303 F. App'x 656, 663–64 (10th Cir. 2008); *see also United States v. Edwards*, 215 F. App'x 417, 420–21 (6th Cir. 2007); *United States v. Vogel*, No. 93-5275, 1994 WL 556994, at *9 (4th Cir. Oct. 12, 1994).

In sum, Cardinas has failed to show that any error on the verdict form affected his substantial rights. We find no plain error with respect to the verdict form and reject Cardinas's claim.

## C.    Cumulative Error

Finally, Cardinas asserts that the cumulative effect of errors at his trial warrants reversal. But we have determined that only one error occurred at trial—the district court's use of the flawed verdict form—and that the error did not affect Cardinas's substantial rights. We therefore reject his cumulative error claim. *See United States v. Rosario Fuentez*, 231 F.3d 700, 709 (10th Cir. 2000) ("Because we identified but one error in this case there is no basis for a cumulative error determination.").

## III.  Conclusion

For the foregoing reasons, we AFFIRM Cardinas's conviction.