**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 21, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

TERRENCE L. HILL, a/k/a Terrance L.
Hill,

    Defendant - Appellant.

No. 20-6065
(D.C. No. 5:19-CR-00032-D-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT***
_____

Before **HOLMES**, **MATHESON**, and **McHUGH**, Circuit Judges.
_____

A jury convicted Terrence L. Hill of being a felon in possession of

ammunition, in violation of 18 U.S.C. § 922(g)(1). He was sentenced to 120 months

in prison. In this appeal, he challenges the sufficiency of the evidence to support his

conviction. Exercising jurisdiction under 28 U.S.C. § 1292, we affirm.

---

    * After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

# I. BACKGROUND

## A. *Events of September 18 and 19, 2018*

Carol Lee testified as follows. On the evening of September 18, 2018, she received a phone call. Although she did not recognize the caller's phone number,[1] she recognized the caller's voice. It was Terrence Hill.

She and Mr. Hill had previously been in a romantic relationship. In April 2018, they broke up. Since their breakup, Mr. Hill had been driving by her home; showing up at her house; and sending her cards, letters, and text messages.

On September 12, 2018, Ms. Lee had filed for a protective order against Mr. Hill. After this filing, his stalking behavior intensified. She claimed Mr. Hill broke windows on her vehicle and flattened her tires. He had continued showing up at her home, and she had seen him walking or driving down her street.

During the September 18 call, Mr. Hill threatened to kill Ms. Lee and her daughter. After she hung up, Ms. Lee called 911. After a police officer came to her house, she passed a sleepless night, frightened by the threatening call.

Around daybreak the next morning, after 6:00 a.m., Ms. Lee was in her living room with her daughter, Javon. Javon was asleep. Ms. Lee saw the motion detectors in both her front and back yard light up. As she moved into her kitchen and looked toward her back patio, she saw Mr. Hill standing outside the glass door. He was

---

[1] The phone that initiated the call belonged to Alisha Naali. She testified she was on a date with Mr. Hill on the evening of September 18 and had lent him her phone.

wearing a black shirt and black shorts. He appeared to be tampering with a motion detector.

Once Mr. Hill saw Ms. Lee, he stepped back from the patio. They began yelling and cursing at each other. This woke Javon, who wandered into the area between the living room and the kitchen. Ms. Lee called out to Javon to call the police. She then turned back to Mr. Hill. Mr. Hill turned as though he were about to walk away. He paused for a second, pulled out a gun, and pointed it at Ms. Lee. Ms. Lee turned around and tried to run. She heard several gunshots, the patio door shattered, and she felt heat in her back. She later discovered she had been shot twice.

Javon Lee testified as follows. On the morning of September 19, she heard a loud commotion. She woke up, ran to the living room,[2] and saw her mother in the kitchen arguing with Mr. Hill. She saw Mr. Hill pacing back and forth on the patio. He was wearing a dark t-shirt and a hat. Like her mother, Javon cursed at him and told him to leave. Someone told Javon to call the police. She ran to the master bedroom to get her phone. On the way back to the kitchen, she heard several shots. She called 911.

The prosecution played a clip for the jury from Javon's 911 call, which began at 6:54 a.m. Two neighbors also called 911 and reported hearing gunshots.

---

[2] Ms. Lee stated that Javon was already with her in the living room, sleeping. Javon's testimony suggests she was in her bedroom and only came to the living room after she woke up.

Amanda Paige Bradbury, a crime scene investigator for the Oklahoma City Police Department, was called to the scene at about 8:35 a.m. She testified that she first went to the hospital and photographed Ms. Lee's injuries, which consisted of graze wounds to her left shoulder and lower left back. She then traveled to Ms. Lee's residence, where she took photographs and located four shell casings on the back patio. Forensic testimony revealed these casings were from .380 caliber ammunition manufactured in Russia.

## B. *Mr. Hill's Statement*

Police arrested Mr. Hill on the afternoon of September 19. Detective Ashley Argo interviewed him after his arrest. Mr. Hill stated that he and Ms. Lee had lived together until their breakup. He admitted that after the breakup he had randomly appeared at Ms. Lee's house and mailed her letters. But he stated he could not have shot Ms. Lee because at the time of the shooting he was working at the Oklahoma State Fairgrounds.

Mr. Hill claimed he got off work at the fairgrounds between 7:00 and 7:15 a.m., then walked to his sister's house about eight miles away.[3] But when Argo obtained his timesheet from the fairgrounds, it showed he left work at 6:15 a.m.

---

[3] Mr. Hill's counsel told the jury that Mr. Hill had lied to the police about walking to his sister's house. He allegedly lied to protect Judy Hudson, his girlfriend, from the investigation. Counsel stated Mr. Hill also did not want Ms. Hudson to find out that he had gone to Vinita Turner's house after Ms. Hudson dropped him off at a 7-Eleven.

### C. *Other Government Evidence*

Judy Hudson testified that during September 2018 she gave Mr. Hill rides to and from his work at the state fairgrounds. On the morning of September 19, she picked him up there between 6:00 and 8:00 a.m. and gave him a ride to the 7-Eleven on West Hefner Road.[4] The 7-Eleven was not far from Ms. Lee's house. After Mr. Hill's arrest, he wrote Ms. Hudson a letter stating she had not dropped him off at the 7-Eleven and had instead taken him to a different location at Britton and North Highland. But she told him she did not remember it that way.

The government also presented evidence from an analysis of Mr. Hill's and Ms. Hudson's cell-phone and cell-site location records. These records showed that on September 19 until 6:23 a.m., Mr. Hill's phone was near the fairgrounds. At 6:28 a.m., it was near Northwest 44th Street and Classen, on the way to the 7-Eleven. After that, there were no location records for his phone until 7:59 a.m., when it registered at a tower at I-44 and I-235, on the way to his sister's house. From 8:07 a.m. to 9:31 a.m., it registered at the towers near his sister's house.

### D. *Mr. Hill's Alibi Evidence*

---

[4] On direct examination, Ms. Hudson stated the 7-Eleven was "off of Western and Hefner." R., vol. 3 at 214. On cross examination, she admitted she had earlier told the police she thought she dropped Mr. Hill off at Britton Road and Western. *See id.* at 218. But on redirect, she explained that she had been mistaken when she told the police about the location of the 7-Eleven. *See id.* at 219-20. The record contains an exhibit showing that the 7-Eleven is located at 1100 West Hefner Road, near Ms. Lee's house on Northwest 99th Street. *See* Suppl. R., vol. 2 at 48.

Three alibi witnesses testified for Mr. Hill. His friend, Vinita Turner, stated that Mr. Hill was dropped off at her house on September 19 at around 6:30 a.m. She could not recall the precise time. She said Mr. Hill asked to wash up at her house, and he stayed there for about 30 to 45 minutes before Ms. Turner took him to the home of his sister, Janet Brooks.

Janet Brooks estimated that Mr. Hill arrived at her house between 6:00 and 7:00 a.m. She remembered seeing a news report that morning about the shooting at Ms. Lee's house, but she did not notice that the shooting involved Ms. Lee. After she got up at around 7:00, she heard her brother, Myron McCoy, talking to Mr. Hill. Soon, Mr. McCoy got a phone call from Carol Lee, who told him Mr. Hill had shot her. Ms. Brooks said Mr. Hill stayed at her house until at least 11:30 a.m.

Mr. McCoy testified that he gets up around 6:00 a.m. every morning and helps Ms. Brooks' kids get ready for school. Their bus comes around 7:15 or 7:20 a.m. On the morning of September 19, he was talking to Mr. Hill at around 8:20 or 8:30 a.m. when he got a call from Ms. Lee. She told him Mr. Hill had shot her. On cross-examination, Mr. McCoy admitted that according to his phone, the call from Ms. Lee came through an hour later than he had thought, at 9:39 a.m.

## II. DISCUSSION

"We review de novo whether there was sufficient evidence to support a defendant's convictions, viewing all the evidence and any reasonable inferences drawn therefrom in the light most favorable to the government." *United States v. Wagner*, 951 F.3d 1232, 1255 (10th Cir. 2020) (internal quotation marks omitted). In

6

making this inquiry, "we do not weigh the evidence or consider the credibility of witnesses." *United States v. Isabella*, 918 F.3d 816, 830 (10th Cir. 2019). Reversal for insufficient evidence is proper "only when no reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.*

To convict a defendant under § 922(g)(1), the government must prove that (1) the defendant had previously been convicted of a felony; (2) he thereafter knowingly possessed a firearm or ammunition; (3) he knew he was a convicted felon when he possessed the firearm or ammunition; and (4) the possession was in or affecting interstate commerce. *United States v. Trujillo*, 960 F.3d 1196, 1200-01 (10th Cir. 2020), *cert. denied*, 2021 WL 2519239 (U.S. June 21, 2021) (No. 20-6162). Mr. Hill admits the government presented facts sufficient to establish each of these elements, except for his knowing possession of the ammunition.[5] He argues the government's evidence pointing to him as the shooter and possessor of the ammunition was insufficient, and that his conviction was merely the result of "piling inference upon inference." *United States v. Anderson*, 189 F.3d 1201, 1205 (10th Cir. 1999). We disagree.

The Lees testified that Mr. Hill fired the shots through the patio door of their residence shortly before 7:00 a.m. on September 19, 2018. Other evidence corroborated their testimony. Ms. Hudson testified she dropped Mr. Hill off at a 7-

---

[5] In summarizing the government's evidence, Mr. Hill does not specifically mention that he had knowledge of his prior felony conviction, *see* Aplt. Br. at 10, but he stipulated to that fact during the trial, *see* R., vol. 3 at 232-33.

7

Eleven near Ms. Lee's house around the time of the shooting. The cell phone records and 911 calls were consistent with this chronology. This evidence, together with the forensic and investigative testimony about the shell casings, was sufficient to support Mr. Hill's conviction.

Mr. Hill attacks this evidence on several grounds. He first argues there was no physical evidence linking him to the ammunition. He complains the investigators failed to submit the ammunition for fingerprint or DNA analysis. But the government's witnesses provided a plausible explanation as to why they did not attempt to develop fingerprints or DNA from the cartridge casings. *See* R., vol. 3 at 147-48, 188. He also complains that the investigators failed to take fingerprints from other surfaces the shooter may have touched, failed to recover the firearm, and failed generally to investigate the possibility that someone else was the shooter. None of these alleged failures defeats the government's case that Mr. Hill was the shooter and therefore possessed the ammunition. *See, e.g.*, *United States v. Magallanez*, 408 F.3d 672, 681 (10th Cir. 2005) ("Lack of physical evidence does not render the evidence that is presented insufficient.").

Mr. Hill next complains that the jury should not have believed the Lees' testimony because (1) they disliked Mr. Hill and had a motive to implicate him in a crime, (2) their testimony was uncorroborated, and (3) neither could have seen the shooter clearly under the adverse lighting conditions. Carol and Javon Lee's testimony was not uncorroborated but was supported by the 911 calls, and the cell-site location evidence that pointed to Mr. Hill's presence at the scene when the

8

crime occurred supported the Lees' account. And it is the jury's task, not that of an appellate court, to determine witness credibility. *See Isabella*, 918 F.3d at 830.

In fact, "we will overturn a jury's credibility determination and disregard a witness's testimony only if the testimony is inherently incredible—that is, only if the events recounted by the witness were impossible under the laws of nature or the witness physically could not have possibly observed the events at issue." *United States v. Cardinas Garcia*, 596 F.3d 788, 794 (10th Cir. 2010) (internal quotation marks omitted). The "inherently incredible" standard is not met here. Though the shooting occurred during the early morning hours and Javon Lee was standing at some distance from the patio door, the testimony would have allowed the jury to conclude that the witnesses could see Mr. Hill. In addition, there was evidence that the Lees heard and recognized Mr. Hill's voice.

Finally, Mr. Hill argues that alibi witnesses Vanita Turner, Janet Brooks, and Myron McCoy testified that he was with them that morning when the shooting occurred. But their testimony was inconsistent with the cell-site records and other evidence the government presented that established Mr. Hill's whereabouts that morning. And "[w]e accept at face value the jury's . . . balancing of conflicting evidence." *Id.*

9

### III. CONCLUSION

Because the evidence was sufficient, we affirm Mr. Hill's conviction.


Entered for the Court


Scott M. Matheson, Jr.
Circuit Judge