FILED
United States Court of Appeals
Tenth Circuit

July 27, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LEPRINO FOODS COMPANY,

Plaintiff-Appellee/
Cross-Appellant,

v.

FACTORY MUTUAL INSURANCE
COMPANY,

Defendant-Appellant/
Cross-Appellee.

Nos. 09-1262 and 09-1287

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 02-cv-1559-RPM-BNB)**

Andrew M. Low (Terry R. Miller with him on the briefs), Davis Graham &
Stubbs LLP, Denver, Colorado, for Defendant-Appellant/Cross-Appellee.

Michael A. Pope, McDermott Will & Emery LLP, Chicago, Illinois (J. Christian
Nemeth and Michael W. Weaver, McDermott Will & Emery LLP, Chicago,
Illinois, and William C. Brittan and Richard O. Campbell, Campbell, Killin,
Brittan & Ray LLC, Denver, Colorado, with him on the briefs), for Plaintiff-
Appellee/Cross-Appellant.

Before **MURPHY**, **McKAY**, and **TYMKOVICH**, Circuit Judges.

**TYMKOVICH**, Circuit Judge.

Leprino Foods Company is a Denver-based mozzarella manufacturer that customarily stores its products in third-party warehouses. In one of these warehouses, flavoring compounds derived from nearby-stored fruit products contaminated a large quantity of cheese. Leprino's "all-risk" insurance policy with Factory Mutual Insurance Company excluded contamination unless it was caused by "other physical damage." When Factory Mutual refused coverage on the basis of the contamination exclusion, Leprino brought suit. A jury determined the contamination was caused by other physical damage and therefore covered by the insurance policy.

On appeal, Factory Mutual contends the verdict is supported by insufficient evidence because Colorado law requires expert testimony, as opposed to lay testimony, to prove causation. Since we conclude Leprino did, in fact, present sufficient expert testimony on this element, we do not reach the question of whether lay testimony alone would be sufficient. Factory Mutual also challenges the district court's jury instructions and its evidentiary ruling on Leprino's revised cold-storage guidelines, but we do not find these to be erroneous. However, we agree with Factory Mutual that Leprino's damages should be reduced by its settlement with the warehouse, so long as the setoff does not include the attorneys' fees that Leprino incurred in pursuing that litigation.

# I. Background

Most of the factual and procedural background to this case is summarized in *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 453 F.3d 1281, 1283 (10th Cir. 2006) (*Leprino I*). We provide here a brief summary relevant to the issues now on appeal.

## A. Storage and Contamination

Leprino is the largest manufacturer of mozzarella cheese in the United States. It stores vast amounts of newly manufactured cheese in cold-storage warehouses before shipment, using its own and third-party warehouses.

In 1998, Leprino entered into an "all-risk" property insurance policy with Arkwright Insurance, a predecessor of Factory Mutual. The policy covered "all risk of physical damage" except where specifically excluded. After Arkwright merged with another insurance company to form Factory Mutual in 1999, Factory Mutual sent Leprino a replacement policy. Both the Arkwright and Factory Mutual policies included a nearly identical exclusion, stating:

> D. This Policy excludes the following *unless directly resulting from other physical damage* not included by this Policy:
>
> 1) *contamination* including but not limited to the presence of pollution or hazardous material.
>
> 2) shrinkage.

R., Vol. 10 at 2444 (emphasis added).

In 2001, Leprino received reports that some of its cheese had an off-odor and an off-flavor, rendering it unusable. Leprino traced the cheese to Gress Warehouse, a third-party warehouse in Pennsylvania that Leprino used to store millions of pounds of cheese. Leprino executives visited the warehouse and noted (1) a strong fruity odor in the warehouse office and freezer areas, (2) spills of fruit juice concentrate all over the warehouse, (3) numerous products whose packaging appeared to have been damaged by forklifts, and (4) stagnant air in the warehouse. Subsequent testing by both parties' experts was consistent and revealed that fruit flavoring compounds, which were also present in the warehouse's air, had contaminated the cheese. The contamination ruined over eight million pounds of cheese, worth more than $13.5 million. Leprino tendered an insurance claim to Factory Mutual, but Factory Mutual denied the claim, relying on the policy's contamination exclusion.

**B. Procedural History**

Leprino filed a complaint against Factory Mutual for breach of contract, declaratory judgment, and damages. It also filed a separate complaint for negligence against Gress in Pennsylvania. The case against Gress settled for $2.4 million.

At a pretrial hearing, the district court granted partial summary judgment in Factory Mutual's favor, holding the loss was not covered under the express terms of the policy. Consequently, the district court limited the scope of trial to

-4-

Leprino's reasonable expectation that the contamination would be covered. A jury then found that Leprino did expect the Factory Mutual policy would cover any contamination changing the flavor of the cheese, but that the expectation was not reasonable.

We reversed and remanded, holding that coverage depended on whether the contamination had been caused by other physical damage and that the district court had erred by excluding evidence concerning the cause of contamination.

On remand, the district court narrowed the trial to "the question of proof of physical damage and the exception to Exclusion D." Supp. R. at 195. With respect to Leprino's burden of proof, the court determined Leprino must show the damage was caused by "some event or condition in the warehouse other than the mere storage of other food products with the cheese." *Id.* at 193. The case proceeded to trial and the jury returned a verdict in favor of Leprino, concluding the damage to Leprino's cheese was directly caused by other physical damage. The parties had stipulated the amount of the loss to be $14 million, and the district court entered judgment for the full amount plus prejudgment interest, totaling $23 million. Factory Mutual filed motions for judgment as a matter of law both at the close of evidence and after the entry of judgment, which the district court denied.

## III.  Analysis

Factory Mutual raises four issues on appeal.  First, it challenges the district court's denial of its motion for judgment as a matter of law, contending Leprino presented insufficient expert testimony that the contamination was caused by fruit products in damaged, as opposed to undamaged, packaging.  Second, it argues the district court erred in instructing the jury to find in Leprino's favor if it determined that the damage to the cheese was caused by some event or condition at the warehouse other than the mere storage of fruit products with the cheese.  Third, Factory Mutual asserts the district court erred by excluding Leprino's revised cold-storage guidelines, because the evidence was offered not to prove culpability but to refute Leprino's theory of causation and to impeach Leprino's witnesses.  Finally, Factory Mutual contends the amount of the judgment should have been reduced by the amount Leprino received in the Gress settlement.  We address each of these issues in turn.

## A.  Sufficiency of the Evidence

Factory Mutual first challenges the district court's denial of its motion for judgment as a matter of law, contending Leprino presented insufficient expert testimony that the contamination was caused by other physical damage.  Factory Mutual argues two possible causes of the contamination existed—either damaged or undamaged fruit products—and only contamination caused by damaged fruit products was covered by the insurance policy.  It also claims the evidence

presented at trial was insufficient to prove the contamination resulted directly from the covered cause, rather than the non-covered cause, because Colorado law requires expert testimony on causation in cases like this one.

We review de novo a district court's denial of a motion for judgment as a matter of law, drawing all reasonable inferences in favor of the opposing party. *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1112 (10th Cir. 2004). We do "not weigh the evidence, pass on the credibility of the witnesses, or substitute [our] conclusions for that of the jury." *Id.* at 1116 (quotation marks omitted). Only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the issue against that party" do we reverse a jury's verdict. FED. R. CIV. P. 50(a)(1).

Because this case arises in diversity, we apply Colorado law in construing the insurance policies at issue. Under Colorado law, insurance policies are interpreted "consistently with the well-established principles of contractual interpretation." *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002). "In order to avoid policy coverage, an insurance policy must establish that the exemption claimed applies in the particular case, and that the exclusions are not subject to any other reasonable interpretations." *Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1090 (Colo. 1991). Absent an indication the parties intended otherwise, "the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words used." *East*

*Ridge of Fort Collins, LLC v. Larimer and Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005). "[B]ecause of the unique nature of insurance contracts and the relationship between the insurer and insured, courts do construe ambiguous provisions against the insurer and in favor of providing coverage to the insured." *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003).

Factory Mutual contends Colorado law requires expert testimony to prove causation in this case, because establishing the cause of chemical contamination is a technical issue requiring an expert to first "rule in" a particular source as a probable cause and then "rule out" all other possible causes. It reads *Truck Ins. Exch. v. Magnetek, Inc.*, 360 F.3d 1206, 1215 (10th Cir. 2004), as requiring expert testimony to prove causation in technical areas beyond the knowledge or experience of non-experts. Furthermore, Factory Mutual relies on *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1124 (10th Cir. 2004), to argue Leprino "must eliminate other possible sources as highly improbable, and must demonstrate that the cause identified is highly probable." In response, Leprino contends no expert testimony is required where lay witnesses provide evidence of causation from which the jury can draw reasonable inferences. It cites *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991), and a series of intermediate Colorado Court of Appeals cases, *see e.g., Rockwell Int'l v. Turnbull*, 802 P.2d 1182, 1183 (Colo. App. 1990), that hold expert testimony is neither necessary nor conclusive in determining causation. Leprino further contends that, while

identifying the chemical compounds in the cheese and in the warehouse air is a technical issue, determining how these compounds traveled from fruit-based products to the cheese is not so complicated as to require expert testimony.

A careful review of the record demonstrates that Leprino presented sufficient expert testimony on causation to support the jury's verdict. Accordingly, we need not reach the issue of whether Factory Mutual would be entitled to judgment as a matter of law in its absence.

Leprino's case on causation was presented primarily through its expert witness, Dr. Michael Qian, a professor of flavor chemistry at Oregon State University. Qian's testimony identified the damaged fruit products as the probable cause of the contamination and eliminated undamaged fruit products as a cause. Qian first pointed to the damaged fruit products as the culpable source by identifying ethyl butyrate as the compound primarily responsible for the contamination and by describing how testing uncovered this compound in a spill sample taken at the warehouse. R., Vol. 8 at 1986, 1994. He testified the "sensory threshold" of ethyl butyrate was so powerful that even a "small amount" of spilled material was capable of contaminating the cheese. *Id.* at 1984–85, 1996.

Next, Qian ruled out the undamaged products as potential sources of the contamination. First, he used the example of a supermarket freezer to opine that the emission of gases from frozen products is ordinarily minimal and would not

likely cause contamination. *Id.* at 2023–24. Second, he testified the slight smell he detected while in direct contact with the undamaged products would not have been enough to contaminate the cheese. *Id.* at 2024. Finally, he described noticeable spikes in the cheese's flavor-damage patterns on certain months that were inconsistent with the relatively steady process of "off-gassing" by undamaged fruit products, suggesting they were not the contamination's source. *Id.* at 2024–25.

Based on these findings, Qian concluded damaged fruit products caused the contamination. *Id.* at 1997. His testimony, fairly considered, points to odor resulting from spills and damaged packaging from the various co-mingled fruit products as contaminating the cheese. Factory Mutual's expert—Dr. Mark Young, a forensic toxicologist—did not rebut this conclusion. As an initial matter, Young's testimony and test results were consistent with Qian's. For example, he testified the spill sample tested by Qian did not contain all of the compounds contaminating the cheese. But Qian did not claim all of the contamination was caused by the single spill he tested. Moreover, Young clarified on cross-examination it was not his opinion that undamaged products caused the contamination. *Id.* at 2335. Rather, he testified the source of the contamination was the storage of various products in the warehouse for a period of time. *Id.* at 2306. Because "various products" does not distinguish between damaged and undamaged products, his testimony does not rebut Qian's

-10-

conclusion that the contamination was caused by the former rather than the latter. In any event, the jury was entitled to credit Qian's opinion as to causation, and the evidence is sufficient to support his conclusions.

Other evidence from witnesses who visited the warehouse bolstered Qian's expert testimony regarding the warehouse conditions. For example, the jury heard testimony that (1) the warehouse was a "real mess," with spills and damaged products everywhere; (2) forklifts had run over products and boxes were broken open; (3) frozen fruit products were in many aisles, and even frozen turkeys were sitting on cheese pallets; and (4) at least one 55-gallon drum of fruit products had spilled. Every witness who visited the warehouse after the contamination was discovered described an unusually strong fruity odor present there. Finally, the testimony of Leprino officials underscored the unusual nature of the contamination. For example, one official testified that Leprino had stored billions of pounds of cheese in third-party warehouses for decades, including storage alongside fruit-based products in the same warehouse, without ever having a contamination of this nature. And Leprino's chairman testified he had never heard of a similar incident in his 56 years in the cheese business.

In sum, the expert testimonies of Qian and Young, bolstered by the lay testimony about the conditions at the Gress warehouse and the unusual nature of the contamination, were sufficient to sustain the jury's determination that the damaged products caused the contamination. And because the jury's verdict was

-11-

supported by substantial expert testimony on causation, the district court did not err in refusing to grant Factory Mutual's motion for judgment as a matter of law.

**B. Jury Instructions**

Next, Factory Mutual challenges the district court's instruction to the jury to find in favor of Leprino if the damage to the cheese was caused by some event or condition at the Gress warehouse other than the mere storage of other food products with the cheese.

The question of whether a jury was properly instructed is a question of law, and thus, our review is de novo. *United States v. Joe*, 8 F.3d 1488, 1500 (10th Cir. 1993). If a jury might have based its verdict on a legally erroneous instruction, the verdict must be reversed. *Level 3 Communs., LLC v. Liebert Corp.*, 535 F.3d 1146, 1158 (10th Cir. 2008). In contrast, the admission or exclusion of a particular jury instruction is left to the sound discretion of the trial court. *Whittington v. Nordam Group Inc.*, 429 F.3d 986 (10th Cir. 2005). In assessing whether the court properly exercised that discretion, a reviewing court must examine the instructions as a whole to determine if they sufficiently cover the issues in the case on the facts presented by the evidence. *Joe*, 8 F.3d at 1500.

Factory Mutual's challenge to the jury instructions is focused on Instruction 6, which charges the jury as follows:

> If you determine that the damage to the plaintiff's cheese was the result of some event or condition at the Gress frozen food warehouse other than the mere storage of other food products with the cheese,

you must find in favor of the plaintiff. Spillage from broken or ruptured packages of the products stored in the warehouse is such an event or condition.

R., Vol. 5 at 1257. Factory Mutual contends the use of the phrase "some event or condition" here constitutes error because it would allow the jury to find for Leprino even in the absence of other physical damage.

We disagree. Taken as a whole, the jury instructions were neither erroneous nor misleading. A trial court has discretion to choose its own wording when formulating instructions, provided it correctly states the law and adequately covers the issues involved in the case. *United States v. Adams*, 914 F.2d 1404, 1408–09 (10th Cir. 1990). Although a defendant is entitled to an instruction regarding his theory of defense, the trial court need not follow the exact language of the instruction tendered by the defendant. *United States v. Hoffner*, 777 F.2d 1423, 1426 (10th Cir. 1985). Rather, the instructions "ought to be stated . . . in the common speech of man if they are to serve their [purpose]." *Tyler v. Dowell, Inc.*, 274 F.2d 890, 897 (10th Cir. 1960). Because "other physical damage" is a term of art whose contours are not readily identifiable, *see Leprino I*, 453 F.3d at 1288, the district court did not err by describing the issue in more easily understandable terms.

As Factory Mutual concedes, the jury instructions use the term "other physical damage" repeatedly. For example, the Statement of the Case Instruction establishes "the issue for the jury to decide in this case is whether the cheese was

-13-

contaminated as a result of physical damage." R., Vol. 5 at 1250–51. Similarly,

Instruction 4 states:

> The question in this case is whether Leprino's loss is insured because of the exception to the contamination exclusion, that is that it directly resulted from *other physical damage*. For the plaintiff to recover from the defendant on its claim for breach of an insurance contract, the plaintiff has the burden of proving by a preponderance of the evidence that the contamination to the cheese resulted from *other physical damage*.[1]

*Id.* at 1255 (emphasis added). In addition, Instruction 5 specifies: "The phrase

'other physical damage' may include damage to the Gress warehouse in which the

plaintiff's cheese was stored or damage to the products stored in the warehouse."

*Id.* at 1266.

After using the term "some event or condition" in Instruction 6, the district

court provided an example that constituted physical damage: "Spillage from

broken or ruptured packages of the product stored in the warehouse is such an

event or condition." *Id.* at 1257. Finally, the jury verdict form uses the phrase

"other physical damage" with no mention of "some event or condition." *Id.* at

1269.

As a whole, the jury instructions repeatedly reference "other physical

damage" in a context plainly indicating the competing theories of the case. Even

---

[1] In between these two sentences, the district court added extemporaneously, "the words in the policy that you've seen go on to say 'other physical damage not excluded by this policy,' but that phrase is not applicable here." R., Vol. 5 at 2381.

-14-

in Instruction 6, the phrase Factory Mutual criticizes was followed by an example demonstrating it was limited to spills, ruptures, or other forms of physical damage. We see no reason to believe the jury was confused or otherwise misled. Thus, the district court neither erred nor abused its discretion when instructing the jury.

## C. Exclusion of Leprino's Revised Cold-Storage Guidelines

Factory Mutual next contends the district court erred when it excluded Leprino's revised cold-storage guidelines as evidence of subsequent remedial measures. The proffered guidelines were intended to show Leprino changed its warehouse policies in response to the contamination. Factory Mutual avers the evidence was offered not to prove negligence or culpability, but rather to refute Leprino's theory of causation and to impeach witnesses who claimed that the storage of cheese with high-aroma items like fruit products was "no problem." Factory Mutual's argument fails because the evidence was properly excluded due to a lack of relevance.

Evidentiary rulings "generally are committed to the very broad discretion of the trial judge, and they may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact or a manifest error in judgment." *Webb v. ABF Freight Sys., Inc.*, 155 F.3d 1230, 1246 (10th Cir. 1998). Even if the court finds an erroneous evidentiary ruling, a new trial

will be ordered only if the error "affected the substantial rights of the parties." *Id.*

Leprino initially contends Factory Mutual waived the right to assert error in the evidence's exclusion because Factory Mutual allegedly argued to the district court only that "Rule 407 per se does not apply in a contract case." Aplee. Response Br. at 49. This construes the trial record too narrowly.

Rule 407 only prohibits the admission of evidence of subsequent remedial measures for the purposes of "negligence, culpable conduct, a defect in a product, or a need for a warning or instruction." FED. R. EVID. 407.[2] The rule permits the evidence's admission for other purposes, such as demonstrating the defendant's control or the feasibility of design changes or safeguards. *See id.* advisory committee's note.

Factory Mutual sought to introduce the evidence of Leprino's revised cold-storage guidelines during the cross examination of Leprino's vice-president of Quality Assurance and Food Safety. The district court sustained Leprino's objection before Factory Mutual's counsel could explain the evidence's purpose. After the jury was dismissed, Factory Mutual's counsel raised the issue again for the record, noting:

> I don't believe remedial measures exclude this in a breach of contract case. I believe you're correct if it was a negligence case, but

_____

[2] The parties disagree on whether Colorado or Federal Rules of Evidence apply. The distinction is unimportant because our analysis is the same under both the state and federal rules.

-16-

changing their position in a contract action, I believe these are admissible and we should be able to go into them.

R., Vol. 7 at 1921.

The objection was sufficient to show a purpose beyond establishing negligence or culpable conduct. "Although, as is frequently the case in the heat of a trial, counsel did not explain the evidentiary basis of his argument as thoroughly as might ideally be desired, . . . he substantially satisfied the requirement of putting the court on notice as to his concern." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 174 (1988); *accord United States v. Caldwell*, 589 F.3d 1323, 1334 n.4 (10th Cir. 2009).

We thus turn to whether the district court erred in excluding the proffered guidelines on relevancy grounds. "The threshold requirement for the admission of evidence is that it have some probative value." *United States v. Larranaga*, 787 F.2d 489, 499 (10th Cir. 1986); *see also* FED. R. EVID. 401, 402. When Factory Mutual attempted to introduce Leprino's revised cold-storage guidelines as evidence, Leprino objected on the basis of relevancy. The district court then twice asked Factory Mutual to explain the guidelines' relevance. After counsel began responding, the court interjected: "Now you're getting into the subject matter of it, and you shouldn't do that. The objection is sustained." R., Vol. 7 at 1835. Thus, the court sustained Leprino's objection partly on relevancy grounds.

Turning to relevancy, the guidelines show Leprino's cold-storage guidelines originally did not mention odors. A 2001 revision added a requirement that Leprino's products be stored "in an environment free of odors." R., Vol 5 at 1441. A second revision in June 2002 rephrased this requirement to "a rodent free, odor free, warehouse, way [sic] from glass products or other chemicals, materials, or agents that could taint the products." *Id.* at 1442.

Because the new guidelines are not limited to regulating the proximity between cheese and *damaged* products, Factory Mutual argues the "obvious implication" of these changes is that Leprino concluded the mere presence of undamaged fruit products in the Gress warehouse was responsible for the contamination. Aplt. Reply Br. at 32. In contrast, Leprino contends the desire to protect its products from damage, odor, and foreign material is a longstanding policy predating the loss in this case. Leprino points to preexisting audit forms and practices that measure whether "activities or conditions" exist that "could potentially contaminate or adulterate" Leprino's cheese. Aplee. Response Br. at 50–51.

Even if Leprino did not have a preexisting policy of protecting its products from odor, the revisions do not shed light on the issue of causation. With regard to the first revision, Leprino's requirement that its cheese be stored in an odor-free environment provides no insight on the question of whether fruit products in undamaged containers can cause damaging odors. With regard to the

second revision, several of its requirements (e.g., a location free of rodents and glass products) do not relate to odor; while the second revision prohibits proximity to chemicals or materials that could taint the cheese, it gives no indication of what those materials could be or how contamination could occur. Thus, these revisions have no probative value on whether undamaged fruit products could have contaminated Leprino's cheese.

The revised cold-storage guidelines also lack relevance for impeachment purposes. Leprino's witnesses did not characterize undamaged fruit products as "high-aroma" items that would be prohibited by the new guidelines. Rather, they testified the only problem with storing mozzarella near fruit products is a greater risk in the instance of "a major spill or something like that where the material was out of the packaging," but "with proper maintenance and proper guidelines, there's not a problem." R., Vol. 7 at 1796, 1918. During a major spill or any other situation in which proper maintenance was not followed, the revised guidelines would reduce the risk of damage to Leprino's products. Tellingly, the revised guidelines, if implemented, would have reduced Leprino's loss in the Gress warehouse if the damaged goods were the sole source of the contamination, as Leprino claims. As a result, the new guidelines are not inconsistent with the testimony presented.

Because the revised cold-storage guidelines lack relevance either to rebut Leprino's theory of causation or to impeach its witnesses, the district court properly excluded them under Rule 402 of the Federal Rules of Evidence.

**D. Damages**

The last issue is whether the amount of the judgment should have been reduced by the $2.4 million that Leprino received in the Gress settlement. In addition to claiming it is entitled to a setoff as a matter of law, Factory Mutual asserts the trial record demonstrates Leprino stipulated to one. Our review of the record suggests Leprino did make the stipulation, but in any case we find Leprino's damages should be reduced by the settlement amount, minus attorney fees, as a matter of law.

Ordinarily, we review a district court's decision to grant or deny a motion to amend judgment for abuse of discretion. *Phelps v. Hamilton*, 122 F.3d 1309, 1324 (10th Cir. 1997). In this case, both parties filed motions on the setoff issue. But rather than ruling on these motions, the district court entered a judgment without fully addressing the issue. Since the judgment *sub silentio* served as a denial of its motion, Factory Mutual contends the district court's order was an interlocutory ruling on a pure question of law, and as such should be reviewed de novo. Because we reach the same conclusion under either standard, we need not determine which applies in this procedural posture.

*1. The Stipulation*

Factory Mutual alleges Leprino stipulated to the setoff during a conference between the parties and the district court before the second trial. According to a transcript of the proceeding, the following exchange occurred:

THE COURT: [D]id we have an agreement somewhere along the way with respect to the amount of the damage?

MR. POPE [Leprino's counsel]: Yes. That's never been a dispute. I mean, it's grown with prejudgment interest, and stuff.

MR. YATES [Factory Mutual's counsel]: *The only issue there would be what you received from Gress Warehouse.*

MR. POPE: *Yes.*

MR. YATES: *And, I believe we got the right to—*

MR. POPE: *No question about that.*

THE COURT: *Yeah, no question about that.*

MR. YATES: But, we did stipulate as to the evidence.

THE COURT: Yeah, that was what it was worth, and it—

MR. POPE: And, we can update that with our current calculations.

THE COURT: —was put in a landfill so there wasn't anything recovered.

MR. POPE: That's one area we've never had any dispute on.

R., Vol. 6 at 1581 (emphasis added). Although Leprino's counsel could conceivably have meant that there was no question the Gress settlement was an unresolved issue, the more plausible interpretation is that he acknowledged the

-21-

settlement should be setoff against the damages.  In its courtroom minutes from the same day, the district court interpreted Leprino's position in precisely this way, noting: "Counsel agree the amount of damages is not disputed and Mr. Yates contends that the Pennsylvania warehouse settlement should be applied as an offset.  *Mr. Pope agrees.*"  R., Vol. 2 at 431 (emphasis added).

Factory Mutual contends the conference transcript and the courtroom minutes evince an oral stipulation.  Leprino disagrees, but it does not offer an alternate explanation for the exchange.  Nor has Leprino challenged the veracity of the courtroom minutes, either before judgment was entered or now on appeal.  But the district court did not address this important factual issue in its Order for Entry of Judgment.  Rather, the court held Factory Mutual was not entitled to a setoff because it breached its contract.

The transcript does suggest the parties reached a stipulation to setoff the Gress settlement.  But as we discuss next, a setoff is required as a matter of law under the facts in this case.

*2.  Double Recovery*

"In a breach of contract action, the objective is to place the injured party in the same position it would have been in but for the breach.  A double or duplicative recovery for a single injury, however, is invalid."  *Protectors Ins. Serv., Inc. v. U.S. Fid. & Guar. Co.*, 132 F.3d 612, 615 (10th Cir. 1998) (citation omitted); *see also* 24 WILLISTON ON CONTRACTS § 64:1 (4th ed.) ("[O]rdinarily a

plaintiff may recover no more than is necessary to provide what he or she would have obtained had both parties fully performed their respective promises.").

Under Colorado law, a plaintiff may not receive a double recovery for the same injuries or losses arising from the same conduct. *Andrews v. Picard*, 199 P.3d 6, 11 (Colo. App. 2007). In the context of insurance, double recovery is usually avoided through the law of subrogation. "When an insurer reimburses a victim for damages pursuant to a claim under the victim's insurance policy, the insurer enjoys a right to subrogation, under which he can stand in the victim's shoes and collect the reimbursed amount from the party responsible for the damages." *Ferrellgas, Inc. v. Yeiser*, 247 P.3d 1022, 1027 (Colo. 2011). "[O]nce the subrogated insurer has resolved the claim, either through litigation or settlement, the insured is no longer entitled to recover the reimbursed portion of the loss from the responsible party." *Id.* Thus, "[s]ubrogation serves the purpose of limiting the possibility of a double recovery by the insured, and secures the ultimate discharge of the debt by the one who in equity and good conscience ought to pay it." *DeHerrera v. Am. Family Mut. Ins. Co.,* 219 P.3d 346, 350 (Colo. App. 2009) (quoting *Western Cas. & Sur. Co. v. Bowling*, 565 P.2d 970, 971 (Colo. App. 1977)).

Here, Leprino's actions against Gress and Factory Mutual are based on the same loss and arise from the same conduct. By all accounts, the dispute between Leprino and Factory Mutual was a good-faith disagreement over whether the

contamination was covered by the insurance policy. Because Leprino settled with Gress before this disagreement was resolved, Factory Mutual did not intervene in Leprino's action against Gress and can no longer exercise its subrogation rights. Absent the policy dispute, Leprino would not recover twice for the same injury, and Factory Mutual's cost of reimbursing Leprino for its damages would be reduced by the settlement amount. We see no reason why the ordinary rule against double recoveries should not apply now that the policy coverage question has been resolved.

To support the district court's ruling, Leprino primarily relies on *Coors v. Security Life of Denver Insurance Co.*, 112 P.3d 59, 64 (Colo. 2005), which holds, "a party to a contract cannot claim its benefit where he is the first to violate its terms." *Coors* is not on point because Factory Mutual's argument is based on the prohibition of double recovery under Colorado law, not a contractual right in the policy.[3]

Leprino also points to several other Colorado cases that it reads to allow contractual recovery in excess of actual damages. The first, *Cingoranelli v. St.*

---

[3] The insurance contract at issue in *Coors* contained a clause providing for a early termination penalty. After materially breaching the contract by overcharging the insured nearly $90,000, the insurer attempted to enforce the penalty by deducting over $111,000 from the policy's surrender value. *Coors*, 112 P.3d at 63. The Colorado Supreme Court held that, because the insured was entitled to exercise his right to return the policy in response to the insurer's breach, he was relieved of the obligation to pay the termination penalty. *Id.* at 64.

*Paul Fire & Marine Ins. Co.*, 658 P.2d 863, 867–69 (Colo. 1983), involved a statutory scheme that (1) required automobile insurance policies to include minimum personal-injury-protection (PIP) coverage amounts for the medical expenses of accident victims, (2) permitted tort actions against the individual legally responsible for the injury only when certain thresholds were met, and (3) required tort recovery to exclude losses that must be paid under the statutory scheme. By ensuring recoveries from the tortfeasor and the insurance company did not overlap, the statutory scheme prevented double recovery. Thus, *Cingoranelli* does not excuse the normal rule.

Leaving aside the PIP coverage issue, the other cases cited by Leprino are likewise distinguishable. For example, Leprino relies on *Bayers v. W.O.W., Inc.*, 426 P.2d 552, 555 (Colo. 1967), a case in which both defendants were tortfeasors. But Leprino's claims against Factory Mutual are based entirely on contract law. Similarly, Leprino cites two cases in which the tort and contract claims were brought against the same defendant and were based on different damages. *See Leeper v. Allstate Ins. Co.*, 738 F. Supp. 1343, 1347 (D. Colo. 1987); *Williams v. Farmers Ins. Grp., Inc.*, 781 P.2d 156, 159 (Colo. App. 1989). In contrast, Leprino's actions in relation to the contaminated cheese were against different defendants and were based on the same loss. The only reasons they resulted in different recoveries are the availability of prejudgment interest and the fact that Gress Warehouse was partly judgment-proof.

-25-

In sum, Colorado law requires a setoff to prevent Leprino from receiving a double recovery for the same loss.

*3. Collateral Source Rule*

Leprino also asserts the setoff is barred by the collateral source rule, which specifies, "if an injured party received some compensation from injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor." 22 AM. JUR. 2D DAMAGES § 392 (2011); *see also* RESTATEMENT (SECOND) OF TORTS § 920A (1979). The rationale for the rule is that it is "considered more just that the benefit be realized by the plaintiff in the form of double recovery rather than by the tortfeasor in the form of reduced liability." *Van Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1074 (Colo. 1992). The rule also "removes the disincentive otherwise faced by potential victims to insure against harm or to accept gratuitous compensation from sources other than the tortfeasor for fear that the tortfeasor will not then be required to pay." *Quinones v. Pa. Gen. Ins. Co.*, 804 F.2d 1167, 1171 (10th Cir. 1986). Because the statutory collateral source rule—codified at COLO. REV. STAT. § 13-21-111.6 (2008)—is limited to tort actions, only the common law rule can govern this case.

The collateral source rule typically operates by preventing a victim's insurance proceeds from reducing the tortfeasor's liability. Here, Leprino seeks to invert the rule so that a recovery from the tortfeasor does not reduce the

amount the victim's insurer must pay under the insurance policy. While Colorado courts have applied the collateral source rule in cases arising in contract, they generally have done so only where the contractual breach directly caused the victim's harm. *See, e.g., Technical Computer Servs., Inc. v. Buckley*, 844 P.2d 1249, 1254 (Colo. App. 1992) (holding unemployment benefits are not deductible to mitigate damages for breach of an employment contract). We are not aware of any case where the rule has been applied to disputes over the amount of coverage provided in an insurance policy.

On the contrary, we have previously held that, even when an insurer has disputed its liability and refused payment of a claim, the collateral source rule should not be applied to prevent the insurer from receiving credit for a settlement with a separate party, providing both the settlement and the judgment represent common damages. *See FDIC v. United Pac. Ins. Co.*, 20 F.3d 1070, 1083 (10th Cir. 1994). Although Utah law governed that case, Colorado federal courts have held *Union Pacific* reflects Colorado law. *See, e.g., The Healthcare Fin. Grp., Inc. v. Clarendon Nat. Ins. Co.*, 2006 WL 2460638 at *3 (D. Colo. Aug. 22, 2006). Secondary legal sources agree with our reasoning. *See, e.g.,* 22 AM. JUR. 2D DAMAGES § 763 ("The collateral-source rule does not apply to exclude evidence of a settlement with a separate party relating to a loss on the same transaction, as the collateral-source rule does not prevent an insurer from receiving credit for settlement with a third party.").

In light of *Union Pacific*, and because the rationale underlying the collateral source rule is not relevant here, we conclude the rule does not apply.

### 4. Reduction for Attorneys' Fees

Finally, Leprino contends that, in the event we allow a setoff, the judgment should include the amount of attorneys' fees it incurred in litigating its claim against Gress and obtaining the resulting $2.4 million settlement. We agree.

Ordinarily, parties bear the expense of their attorneys. *Hawes v. Colo. Div. of Ins.*, 65 P.3d 1008, 1015 (Colo. 2003). Several exceptions exist, including the common fund doctrine—an equitable remedy originating in fiduciary law and grounded in the principles of quantum meruit and unjust enrichment. *Id.* The common fund doctrine permits an apportionment of attorneys' fees "under circumstances where a party has been successful in creating a fund from which other passive beneficiaries derive monetary advantage." *County Workers Comp. Pool v. Davis*, 817 P.2d 521, 526 (Colo. 1991). It can only apply when, but for the plaintiff's actions, the beneficiaries would have been forced to institute the litigation themselves to achieve any benefits. 6 COLO. PRAC., CIVIL TRIAL PRACTICE § 13.4 (2d ed.). The common fund doctrine is designed to prevent unjust enrichment by requiring beneficiaries to bear a fair share of the cost of litigation. *Trevino v. HHL Fin. Servs. Inc.*, 928 P.2d 766, 769 (Colo. App. 1996).

Colorado courts have applied the common fund doctrine in cases where a subrogation relationship exists among the parties, such as when an injured

employee's claim against a tortfeasor is settled for an amount greater than the insurer's subrogation claim for workers compensation benefits. *See id.* The Colorado Supreme Court has held that not permitting apportionment in such circumstances would "result[] in a substantial pecuniary benefit to the insurer at the expense of the employee," particularly where the insurer has not actively participated in the tort litigation. *County Workers*, 817 P.2d at 526.

The equitable principles underlying the application of the common fund doctrine in subrogation cases are applicable here. Leprino's settlement with Gress created a fund from which Factory Mutual alone derived a monetary advantage, in the form of a reduction of its contractual liability. Leprino gains no benefit from having pursued the costs and risks of litigation. Not reducing the setoff by attorneys' fees would put Leprino in a worse position than it would be if it had not sought compensation from Gress and instead relied on its insurance policy. As the Sixth Circuit concluded based on similar facts,"[i]f [an insurer] wrongfully denies coverage, even in good faith, it must pay its proper share of expenses reasonably incurred by the insured in recovering from a third party when the benefits of the recovery also inure to the insurer." *Louisville & Jefferson Cnty. Metro. Sewer Dist. v. Travelers Ins. Co.*, 753 F.2d 533, 540 (6th Cir. 1985). The same principle governs here.

In sum, it is equitable for Factory Mutual to shoulder the cost of Leprino's litigation against Gress because Factory Mutual alone bears the benefit of the

resulting settlement.  Consequently, the setoff should be reduced by Leprino's attorneys' fees and associated litigation costs.

### III.  Conclusion

The decision of the district court is AFFIRMED in part and REVERSED in part.  We REMAND to the district court to enter a new judgment setting off from Leprino's damages the amount from the Gress settlement, minus attorneys' fees and associated litigation costs, in a manner consistent with this opinion.  Because we affirm the district court's decision and do not reach Leprino's claim on conditional cross-appeal on the issue of reasonable expectations, we DENY as moot Factory Mutual's motion to strike Leprino's reply brief as a sur-reply.