**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

LARENZO MONTEL GABOUREL,

     Defendant - Appellant.
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

WESLEY TAVION GRANT,

     Defendant - Appellant.

No. 16-6227
(D.C. No. 5:15-CR-00172-D-2)
(W.D. Oklahoma)

No. 16-6228
(D.C. No. 5:15-CR-00172-D-1)
(W.D. Oklahoma)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY**, **BRISCOE**, and **McHUGH**, Circuit Judges.
_____

Larenzo Montel Gabourel and Wesley Tavion Grant were tried together and

convicted of drug crimes relating to the possession and distribution of Phencyclidine

(PCP). Mr. Gabourel appealed, claiming that the evidence was insufficient to support his

_____

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

convictions and that the district court committed plain error by not giving a drug-addict jury instruction. In a separate appeal, Mr. Grant also contends the evidence was insufficient to support his convictions, and he argues the district court abused its discretion in admitting evidence of his prior convictions and gang affiliation.

The appeals were briefed and argued separately, but because they arise out of the same set of facts, we consolidate them for disposition and consider both appeals in this Order and Judgment. For the reasons we now explain, we affirm each of the defendants' convictions.

## I.    BACKGROUND

### A.  *Factual History*[1]

In the spring of 2015, Mr. Gabourel, Paul Thomas, and Alvin Norman drove from Los Angeles, California to Oklahoma City, Oklahoma. Mr. Thomas traveled to visit his friend, Mr. Grant, who was living in Oklahoma City at the time. Mr. Grant asked if Mr. Thomas would bring Mr. Norman along, and Mr. Norman invited Mr. Gabourel. Prior to this trip, Mr. Gabourel had not met Mr. Thomas or Mr. Grant. The three men arrived in Oklahoma around May 12, 2015.

Mr. Thomas and Mr. Grant spent most of their time together in Oklahoma getting high on PCP, Oxycontin, and Xanax at a "stash house" located in the Invitational

---

[1] "We recite the facts in the light most favorable to the jury's verdict." *United States v. Berry*, 717 F.3d 823, 827 (10th Cir. 2013).

Apartments.[2] Around May 16, Mr. Thomas spoke with Mr. Gabourel about finding a source of money. Mr. Gabourel said "he knew somebody that would get him some PCP if [Mr. Thomas] knew anybody" wanting to buy. Mr. Thomas responded that he knew someone who probably would buy.

The next day, May 17, Mr. Thomas arrived at the stash house to find Mr. Gabourel in the kitchen mixing (or "cutting") the PCP with "starter fluid or something" to make it "look like it's more than what it is." Mr. Thomas asked Mr. Gabourel where he got the PCP, and Mr. Gabourel responded that "[h]is people looked out for him." Mr. Thomas and Mr. Grant smoked some of this PCP, and both said it was "garbage," but Mr. Thomas "knew somebody" who would likely buy it anyway.

Mr. Thomas contacted the potential buyer to see if he would be interested in purchasing the PCP. Unbeknownst to Mr. Thomas, this person was a confidential informant who then alerted the authorities. On May 18, Mr. Thomas and Mr. Norman met the informant at a local Walmart to discuss a future sale of PCP. Afterward, the police followed Mr. Thomas and Mr. Norman back to the stash house. Mr. Thomas then informed Mr. Gabourel "that [his] people might want to get something from [Mr. Gabourel], get some of that."

The following day, the police observed Mr. Thomas, Mr. Grant, Mr. Norman, and Mr. Gabourel leave the apartment and get into a car. The police followed the four men to

---

[2] The government refers to this apartment as a "stash house" because it "had no electricity and there [were] no furnishings of any kind," but it contained a large quantity of PCP.

3

a restaurant, where the men went inside to eat. While at the restaurant, the informant called Mr. Thomas and said he "had somebody that wanted something." They set up a meeting at Walmart to exchange two ounces of PCP for $450. When Mr. Thomas ended the call, he told Mr. Gabourel that "somebody might want some of that garbage [Mr. Gabourel] got."

Mr. Thomas then drove the men back to the stash house. Mr. Grant, Mr. Norman, and Mr. Gabourel went into the apartment while Mr. Thomas waited in the car. Mr. Grant and Mr. Norman returned to the car shortly thereafter, but Mr. Gabourel stayed at the apartment. Mr. Thomas, Mr. Grant, and Mr. Norman then drove to Walmart to sell the PCP.

At Walmart, Mr. Norman got into the informant's car, which was also occupied by an undercover officer posing as the "buyer." Mr. Norman sold the officer two ounces of PCP contained in two vanilla extract bottles. Upon completion of the sale, Mr. Norman rejoined Mr. Thomas and Mr. Grant in the other car and they left Walmart, with authorities following.

The police later initiated a traffic stop, during which they found $450 on Mr. Norman. The police arrested the men and transported them to the police station for questioning. While Mr. Grant was walking through the parking lot, a third bottle of vanilla extract containing one ounce of PCP fell from his buttocks onto the ground.

Meanwhile, the authorities waiting at the stash house could detect the odor of PCP from "15 to 20 feet away from the door" to the apartment. They obtained a search warrant and then entered the apartment, yelling "[p]olice, search warrant, get on the

4

ground." The police found "slightly less than one gallon" of PCP in the kitchen. Several officers testified this was the most PCP they had ever recovered in a single police operation. They also found a plastic medicine dropper for transferring liquid, and three empty boxes for bottles of vanilla extract, matching the size and type exchanged during the drug buy and dropped by Mr. Grant during the arrest.

The officers found Mr. Gabourel in the bedroom, and he admitted to having a gun in his pocket.[3] The officer who handcuffed Mr. Gabourel removed a revolver loaded with five rounds of ammunition from Mr. Gabourel's pocket. In the bedroom, the police also found Mr. Grant's wallet which contained his birth certificate, social security card, and an appearance bond for Oklahoma County court.

### B. *Procedural History*

Mr. Thomas, Mr. Grant, Mr. Norman, and Mr. Gabourel were indicted by a federal grand jury in the Western District of Oklahoma. Mr. Gabourel was charged with Count 1: conspiracy to possess with intent to distribute and to distribute PCP; Count 3: possession of PCP with intent to distribute or aiding and abetting; and Count 4: possession of a firearm in furtherance of a crime. 21 U.S.C. §§ 841(a)(1), 846; 18 U.S.C. §§ 2, 924(c)(1)(A)(i). Mr. Grant was charged with Count 1: conspiracy to possess with intent to distribute and to distribute PCP; Count 2: distribution of PCP or aiding and abetting; and Count 3: possession of PCP with intent to distribute or aiding and abetting. 21 U.S.C.

---

[3] Mr. Gabourel contends he was sleeping in the bedroom when the police entered the apartment, and he grabbed a gun that was lying on the bed and put it in his pocket, because Los Angeles gangs will break into homes and yell "police" so they can steal valuables. Mr. Gabourel claims the gun was not his.

§§ 841(a)(1), 846; 18 U.S.C. § 2. Mr. Thomas pled guilty prior to trial, agreeing to cooperate as a government witness, and Mr. Norman was a fugitive at the time of trial.[4] Thus, only Mr. Grant and Mr. Gabourel were tried together.

Prior to trial, the government moved to admit evidence of Mr. Grant's prior convictions and gang affiliation. First, the government filed a Federal Rule of Evidence 404(b) Notice of intent to introduce evidence of Mr. Grant's prior convictions for drug offenses, including prior possession of PCP. The government sought to use this evidence to prove intent, plan, knowledge, and absence of mistake or accident. The district court admitted the evidence over Mr. Grant's objection. Second, the government moved in limine to admit evidence of Mr. Grant's gang affiliation. The district court reserved ruling on the motion until trial.

At the start of trial, Mr. Gabourel's counsel indicated his intent to introduce evidence of both Mr. Thomas's and Mr. Grant's affiliation with the Bloods gang. Counsel explained this evidence supported the defense's theory that Mr. Thomas had provided perjured testimony blaming Mr. Gabourel, who was not a gang member, for obtaining the PCP rather than "turn[ing] around on his own people." In response, Mr. Grant's counsel moved to sever the trial. The district court denied the motion, but it reserved ruling on whether the parties could elicit evidence of gang affiliation, stating there could be "no mention of gang affiliation without approaching the bench, . . . and then we will have to take it up after I have had the benefit of hearing a little bit more testimony in the case."

---

[4] Mr. Norman was later captured and pled guilty to Count 2 (distribution of PCP).

The trial moved forward with the government presenting its first three witnesses. Before the government called Mr. Thomas as the fourth witness, the district court asked counsel to approach the bench to determine what the parties intended to ask about gang affiliation. The government indicated it would only question Mr. Thomas about his own gang affiliation, and not that of Mr. Grant. But Mr. Gabourel's counsel reiterated that he intended to ask Mr. Thomas questions about the gang affiliation of Mr. Thomas, Mr. Grant, and Mr. Norman to support the defense that the others were implicating Mr. Gabourel, rather than fellow gang members. The district court allowed this line of questioning, concluding it would be unnecessary to evaluate the evidence under Federal Rule of Evidence 404(b) because the government would not be asking any questions about Mr. Grant's gang affiliation. Mr. Gabourel's counsel then asked Mr. Thomas if he and Mr. Grant were both Bloods members, and Mr. Thomas responded "yes."

Although the government and Mr. Grant filed proposed jury instructions prior to trial, Mr. Gabourel did not. The trial was held January 19–21, 2016. After the government's presentation of evidence and again at the close of his case, Mr. Grant moved for a judgment of acquittal, which the district court denied. Despite a note to the judge earlier that morning suggesting some division, on January 22, the jury convicted Mr. Gabourel and Mr. Grant on all charges.

The district court sentenced Mr. Gabourel to 180 months' imprisonment, and it sentenced Mr. Grant to life imprisonment.[5] Both defendants filed timely appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## II.   CASE NO. 16-6227, MR. GABOUREL'S APPEAL

On appeal, Mr. Gabourel contends the evidence was insufficient to support his convictions. He also claims the district court plainly erred in not sua sponte providing the jury with a drug-addict instruction. Considering each argument in turn, we conclude that the evidence was sufficient to support the verdict and that the district court did not plainly err by not instructing the jury on addict witnesses.

### A.   *Sufficiency of the Evidence*

"We review sufficiency of the evidence claims de novo, but examine the evidence in the light most favorable to the government and ask only whether any rational juror could have found [the defendant] guilty beyond a reasonable doubt." *United States v. Oldbear*, 568 F.3d 814, 822–23 (10th Cir. 2009). "In reviewing the sufficiency of the evidence, we must consider both direct and circumstantial evidence, as well as the reasonable inferences to be drawn from that evidence," *United States v. Brooks*, 438 F.3d 1231, 1236 (10th Cir. 2006) (internal quotation marks omitted), and "a criminal conviction may be sustained on wholly circumstantial evidence," *United States v. Ortiz-Ortiz*, 57 F.3d 892, 895 (10th Cir. 1995). We do not make credibility determinations or weigh conflicting evidence. *United States v. Taylor*, 592 F.3d 1104, 1108 (10th Cir.

---

[5] Mr. Grant was subject to a longer sentence than Mr. Gabourel due to his more extensive criminal history.

2010); *United States v. Youngpeter*, 986 F.2d 349, 352–53 (10th Cir. 1993) ("[I]t is for the jury to decide which witnesses to believe and which not."). "While the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Erickson*, 561 F.3d 1150, 1158–59 (10th Cir. 2009) (internal quotation marks omitted).

Mr. Gabourel contends there is insufficient evidence to support the jury's verdict of guilty on (1) conspiracy to possess with intent to distribute and to distribute PCP, (2) possession of PCP with intent to distribute (or aiding and abetting), and (3) possession of a firearm in furtherance of a crime. We discuss each charge in turn, and conclude the evidence is sufficient to support Mr. Gabourel's convictions.

**1. Count 1: Conspiracy to Possess with Intent to Distribute and to Distribute PCP**

To convict Mr. Gabourel of conspiracy, the government was required to prove beyond a reasonable doubt that: (1) two or more persons agreed to distribute, or possessed with intent to distribute, PCP; (2) Mr. Gabourel "knew the essential objectives of the conspiracy"; (3) Mr. Gabourel "knowingly and voluntarily became a part of the conspiracy"; (4) there was "interdependence among the members of the conspiracy"; and (5) the conspiracy involved at least one kilogram of a mixture containing a measurable amount of PCP. *See United States v. Patterson*, 713 F.3d 1237, 1245 (10th Cir. 2013). The government met its burden.

At trial, the government presented evidence of an agreement and knowledge of the conspiracy by eliciting testimony that Mr. Thomas and Mr. Gabourel spoke on May 16

9

about finding a source of money. Mr. Gabourel agreed to obtain PCP and Mr. Thomas agreed to find a buyer. The government established that Mr. Gabourel knowingly and voluntarily became a part of the conspiracy by agreeing to obtain and actually obtaining the PCP, "cutting" the PCP with "starter fluid or something" to stretch it for sale, and later guarding the remaining PCP at the stash house while the other conspirators went to the sale. The government established interdependence because Mr. Gabourel obtained the PCP, Mr. Thomas found a buyer, Mr. Norman sold the PCP to the undercover officer with Mr. Grant and Mr. Thomas serving as protection during the sale, and Mr. Gabourel stayed at the stash house with a loaded gun. Finally, the police recovered almost a gallon of a mixture containing PCP at the stash house. This evidence is sufficient to support a finding of each element of conspiracy against Mr. Gabourel.

Mr. Gabourel disagrees and contends the jury unreasonably relied on Mr. Thomas's testimony, which Mr. Gabourel claims was inherently incredible. It is well established that a jury may convict a defendant solely on the uncorroborated testimony of a single coconspirator. *See United States v. Thomas*, 749 F.3d 1302, 1314 (10th Cir. 2014). And "we will overturn a jury's credibility determination and disregard a witness's testimony only if the testimony is inherently incredible—that is, only if the events recounted by the witness were impossible 'under the laws of nature' or the witness 'physically could not have possibly observed' the events at issue." *United States v. Cardinas Garcia*, 596 F.3d 788, 794 (10th Cir. 2010) (citation omitted); *see also Tapia v. Tansy*, 926 F.2d 1554, 1562 (10th Cir. 1991). We have described the doctrine of inherent incredibility as a "longshot" because a factfinder's credibility determinations are

"virtually unreviewable on appeal." *Cardinas Garcia*, 596 F.3d at 795 (internal quotation marks omitted); *see also United States v. Williams*, 216 F.3d 611, 614 (7th Cir. 2000) ("We must leave open the possibility that even a liar tells the truth once in a while, and the jury is in the best position to judge [a witness's] credibility.").

Mr. Gabourel contends that although he was present briefly at the stash house, he did not participate in the conspiracy. He claims he spent the first night in Oklahoma City at the Invitational Apartments, but that the next morning Mr. Thomas drove him to Langston, Oklahoma, where Mr. Gabourel visited his friend Chris White, a student at Langston University. According to Mr. Gabourel, he stayed in Langston until late in the evening on May 18, when he returned to the Invitational Apartments in Oklahoma City by Uber. Mr. White confirmed this testimony and Mr. Grant partially corroborated it, stating that he remembered dropping Mr. Gabourel somewhere "kind of far out" and then not seeing him again until the day they were arrested.

Mr. Gabourel asserts that the government's only evidence tying him to the drug trafficking came from the uncorroborated testimony of Mr. Thomas, a known gang member, drug addict, and convicted drug dealer. According to Mr. Gabourel, Mr. Thomas's testimony that he spoke to Mr. Gabourel on May 16 about finding a source of cash and that he saw Mr. Gabourel on May 17 "cutting" the PCP was a "physical impossibility" because he was in Langston, Oklahoma during that time. He adds that there was no evidence that he had a key or otherwise had access to the stash house. And he claims Mr. Thomas's testimony was a physical impossibility because the police did

11

not recover a box or container for the starter fluid that Mr. Thomas allegedly saw Mr. Gabourel mixing into the PCP.

But none of these arguments establish inherent incredibility. Despite Mr. Grant's and Mr. White's testimony that Mr. Gabourel went to Langston, there is no evidence establishing Mr. Gabourel physically could not have returned to Oklahoma City, would have had to be in two places at the same time, or otherwise violated the laws of nature. *See Tapia*, 926 F.2d at 1562 ("Nor does the fact that there are several conflicting versions [of the facts] affect our determination of credibility as a matter of law."). Instead, the testimony of the witnesses "presented two distinct versions of the historical facts. In these situations, we have held that the testimony of a drug dealer's compatriots, regardless of whether the testimony is 'confused' or 'self-contradicting,' is not inherently incredible." *Cardinas Garcia*, 596 F.3d at 796; *see also Tapia*, 926 F.2d at 1562.

Moreover, the evidence belies any suggestion that Mr. Gabourel did not have physical access to the stash house. It is undisputed he stayed there on the first night of his trip and on the night before his arrest. The jury also could credit Mr. Thomas's testimony that he spoke with Mr. Gabourel at the apartment on May 16 about finding a source, and then saw him again in the apartment on May 17 "cutting" the PCP. Despite Mr. Gabourel's insistence that Mr. Thomas was lying, the testimony would not have been physically impossible or against the laws of nature. *See Cardinas Garcia*, 596 F.3d at 796 (rejecting an inherent incredibility argument where the witness frequently saw the defendant at the stash house and nothing impeded his ability to observe the defendant's actions). And although the police did not recover a container for the lighter fluid, it was

12

not physically impossible for Mr. Gabourel or someone else to throw the container in the garbage or otherwise dispose of it. Thus, the jury was free to believe Mr. Thomas's testimony, rather than that of Mr. Gabourel and Mr. White.

Finally, even without Mr. Thomas's testimony, the jury could reasonably infer that Mr. Gabourel was a member of the conspiracy. He went on a road trip with two convicted drug dealers (Mr. Thomas and Mr. Norman) and stayed at an apartment with a third convicted drug dealer (Mr. Grant). Police found Mr. Gabourel alone with a loaded gun in the apartment, which lacked furniture other than a mattress and had no electricity. And the apartment reeked of PCP such that the police officers testified it could be detected from 15 to 20 feet outside the apartment door. Finally, the quantity of PCP found in the apartment was the largest amount any of the police officers previously had recovered at a single location.

It is true that Mr. Gabourel cites several cases where there was perhaps more evidence of a defendant's involvement in a conspiracy. But this does not mean the evidence here was insufficient or that Mr. Thomas's testimony was "inherently incredible." The jury could therefore credit that testimony in finding Mr. Gabourel knowingly participated in a conspiracy to possess PCP with the intent to distribute.

**2. Count 3: Possession with Intent to Distribute or Aiding and Abetting**

Possession with intent to distribute requires the government to prove that Mr. Gabourel knowingly or intentionally possessed at least one kilogram of PCP with the intent to distribute it. *See United States v. Jacobs*, 579 F.3d 1198, 1200 (10th Cir. 2009). Possession may be actual or constructive. *See United States v. Avery*, 295 F.3d 1158,

13

1177 (10th Cir. 2002) ("Generally speaking, possession of contraband, whether it be drugs or a firearm, may be either actual or constructive." (internal quotation marks omitted)).

Actual possession occurs when a defendant "knowingly has direct physical control over an object or thing." *United States v. Turner*, 553 F.3d 1337, 1343 (10th Cir. 2009). Mr. Gabourel contends the government presented no evidence of actual possession. To reach this conclusion, he ignores Mr. Thomas's testimony and argues he was "merely present" at the apartment from which the others sold drugs. But, as discussed above, the jury was free to believe Mr. Thomas's testimony and that testimony places Mr. Gabourel in actual possession of the PCP, which he first obtained and then cut with another substance. As a result, the evidence is sufficient to support the jury's finding that Mr. Gabourel actually possessed PCP with the intent to distribute.

## 3.  Count 4: Possession of a Firearm in Furtherance of a Crime

Possession of a firearm in furtherance of a drug trafficking crime requires the government to demonstrate that Mr. Gabourel: (1) committed the crimes alleged in either Count 1 or Count 3, (2) possessed a firearm, and (3) possessed the firearm in furtherance of one of the crimes in Count 1 or Count 3. *See* 18 U.S.C. § 924(c)(1)(A)(i); *Avery*, 295 F.3d at 1179.

It is undisputed that Mr. Gabourel possessed a firearm at the time of his arrest. Thus, the only remaining issue is whether Mr. Gabourel possessed the firearm *in furtherance of* either the conspiracy or the substantive crime of possession with intent to distribute.

As its plain language indicates, 18 U.S.C. § 924(c) does not punish possession of a firearm alone. Indeed, when Congress added the "possession" prong to § 924(c) in 1998, it "expressly clarified that the addition to the statute was not intended to cover every possession of a firearm by one who also is a drug trafficker." *United States v. Iiland*, 254 F.3d 1264, 1271 (10th Cir. 2001); *Avery*, 295 F.3d at 1175 ("[T]he mere possession of the firearm by a person connected to and engaged in a drug trafficking crime is insufficient to trigger § 924(c)(1)."). "The mere presence of a firearm in an area where a criminal act occurs" is not enough to establish that the firearm was "in furtherance of" a drug crime; "[r]ather, the government must illustrate through specific facts, which tie the defendant to the firearm, that the firearm was possessed to advance or promote the criminal activity." *Iiland*, 254 F.3d at 1271 (quoting H.R. Rep. No. 105-344, at 9 (1997)); *see also Avery*, 295 F.3d at 1175 ("The 'in furtherance of' language requires the government to show that the weapon 'furthered, promoted or advanced' either a crime of violence or a drug trafficking crime." (internal quotation marks omitted)). To show the weapon "furthered, promoted or advanced" the drug crime, the government must "establish some nexus between the firearms and the underlying drug trafficking crime." *United States v. Luke-Sanchez*, 483 F.3d 703, 706 (10th Cir. 2007).

"A sufficient nexus can be demonstrated by showing a defendant intentionally kept a firearm available while conducting a drug transaction." *United States v. Rogers*, 556 F.3d 1130, 1140 (10th Cir. 2009). Because defendants will rarely admit they intended to possess a firearm in furtherance of a drug trafficking crime, intent "is

15

generally proven through circumstantial evidence." *Id.* To determine intent

circumstantially, we consider several nonexclusive factors:

> (1) the type of drug activity being conducted,
> (2) the accessibility of the firearm,
> (3) the type of firearm,
> (4) the legal status of the firearm,
> (5) whether the firearm is loaded,
> (6) the proximity of the firearm to drugs or drug profits, and
> (7) the time and circumstances under which the firearm is found.

*United States v. Robinson*, 435 F.3d 1244, 1251 (10th Cir. 2006).

Five of these seven factors weigh in favor of a conclusion that Mr. Gabourel

possessed this firearm "in furtherance of" a drug trafficking crime. The type of drug

activity being conducted was conspiracy to possess and distribute PCP, and the actual

possession of a massive amount of PCP with the intent to distribute—thereby suggesting

a need to protect that valuable quantity of drugs from other criminals. The firearm was

readily accessible for that purpose, as it was in Mr. Gabourel's pocket and already loaded

with five rounds.[6] The type of firearm was a handgun, a type "widely recognized as a tool

of the drug dealers['] trade." *United States v. Bunner*, 134 F.3d 1000, 1006 (10th Cir.

1998). And while Mr. Gabourel and the firearm were located in the bedroom, and the

PCP was in the kitchen of the small apartment, they were not so far removed in proximity

as to negate the inference that possession of the gun was in furtherance of the drug

crimes.

---

[6] The ownership and legal status of the firearm is unknown, as the government did not present any evidence on gun ownership.

Finally, the "time and circumstances" also weigh in favor of the inference that Mr. Gabourel possessed the firearm in furtherance of the crime. He was alone in the apartment after Mr. Thomas, Mr. Norman, and Mr. Grant went to sell some of the PCP. Although Mr. Gabourel claims he grabbed the gun because he was concerned that gang members might be impersonating the police to steal "valuables," it is undisputed that the only thing of value in the apartment was the PCP. And based on Mr. Thomas's testimony, the jury could reasonably infer that after Mr. Gabourel obtained a large amount of PCP from "his people," it was in his interest to "guard" it against theft.[7]

Mr. Gabourel contends, however, that this evidence is insufficient because the government did not ask Mr. Thomas why Mr. Gabourel stayed at the apartment while the rest of the group went to sell the PCP. He argues the government "simply did not ask and instead chose to speculate in closing arguments that [Mr. Gabourel's] role was to protect the PCP." In support, he contrasts the evidence here with that in *United States v. Archuleta*, where the government presented testimony that "Mr. Archuleta's role was to keep an eye on the property so that no one would break in, kind of like a guard, security." 19 F. App'x 827, 829 (10th Cir. 2001) (unpublished) (internal quotation marks omitted). And he cites *United States v. Dunmire* for the proposition that "[w]hile the jury may draw reasonable inferences from direct or circumstantial evidence, an inference must be more

---

[7] Mr. Gabourel contends this inference is unreasonable because the PCP was left unattended while the four men went to the restaurant. But the government argued at trial that drugs left unguarded are at their most vulnerable during a drug deal, because the purchaser could force the seller to lead him to the stash house.

than speculation and conjecture to be reasonable." 403 F.3d 722, 724 (10th Cir. 2005) (internal quotation marks omitted).

But the government's decision not to question Mr. Thomas about whether Mr. Gabourel was left behind to guard the PCP does not lead to the conclusion that the jury's verdict was based on speculation or conjecture. Instead, the jury could reasonably infer from the compelling, circumstantial evidence, that Mr. Gabourel grabbed the gun to protect the PCP. And this was enough to support the jury's finding that Mr. Gabourel possessed the gun in furtherance of the drug crimes and was therefore guilty under § 924(c). *See Ortiz-Ortiz*, 57 F.3d at 895 ("[A] criminal conviction may be sustained on wholly circumstantial evidence.").

## B. *Jury Instructions*

Mr. Gabourel next contends the district court plainly erred in failing to give the following model jury instruction, even though he did not request it:

**WITNESS'S USE OF ADDICTIVE DRUGS**

The testimony of a drug abuser must be examined and weighed by the jury with greater caution than the testimony of a witness who does not abuse drugs.

[Name of witness] may be considered to be an abuser of drugs.

You must determine whether the testimony of that witness has been affected by the use of drugs or the need for drugs.

Tenth Circuit Pattern Jury Instruction 1.16.

Mr. Gabourel concedes that he failed to request this instruction and also failed to object to the jury instructions proposed by Mr. Grant and the government. Thus, we

18

review Mr. Gabourel's claim that the district court should have sua sponte instructed the jury on Mr. Thomas's use of addictive drugs for plain error. *See United States v. Fabiano*, 169 F.3d 1299, 1302 (10th Cir. 1999). To establish plain error, Mr. Gabourel must show: (1) an error; (2) that is plain—i.e., clear or obvious; and (3) that affected his substantial rights. *United States v. Rosales-Miranda*, 755 F.3d 1253, 1258 (10th Cir. 2014). If he meets these three requirements, then we may exercise our discretion to correct the error if it "seriously affected the fairness, integrity, or public reputation of the judicial proceedings below." *United States v. Cardinas Garcia*, 596 F.3d 788, 798 (10th Cir. 2010).

We need not decide whether failing to include the drug-addict instruction was error because—even assuming it was error—it was not plain. Accordingly, we also need not consider whether it affected Mr. Gabourel's substantial rights.[8]

For an error to constitute "plain" error, it must be "obvious or clear," or "contrary to well-settled law." *United States v. Duran*, 133 F.3d 1324, 1330 (10th Cir. 1998). "Well-settled law" means either our precedent or that of the Supreme Court. *United States v. Edgar*, 348 F.3d 867, 871 (10th Cir. 2003). In our circuit, a district court "must instruct the jury as required by the law and the evidence, whether the parties request an instruction or not." *United States v. Jaynes*, 75 F.3d 1493, 1504 (10th Cir. 1996). And we

---

[8] And because we do not reach the question of whether any alleged error affected Mr. Gabourel's substantial rights, we need not address Mr. Gabourel's argument that the jury's note to the district court, which suggested the jurors were struggling to reach a unanimous verdict with respect to one of the defendants, evidences harm to his substantial rights.

have held that, "[a]s a general rule, prudence dictates the giving of an addict instruction whenever the prosecution has relied upon the testimony of a narcotics addict." *United States v. Smith*, 692 F.2d 658, 661 (10th Cir. 1982). But "whether refusal to so instruct is reversible error depends on the particular facts of each case." *United States v. Cook*, 949 F.2d 289, 294 (10th Cir. 1991).

We do not consider the omission of this instruction in isolation; rather, we review the instructions "as a whole to determine whether the jury may have been misled, upholding the judgment in the absence of substantial doubt that the jury was fairly guided." *United States v. Wiktor*, 146 F.3d 815, 817 (10th Cir. 1998) (per curiam) (internal quotation marks omitted). In *Smith*, we concluded the district court did not abuse its discretion in rejecting the defendant's proposed drug-addict jury instruction because:

> The instructions to the jury on accomplice, immune informant, and felon testimony, along with the general credibility instruction, were sufficient to alert the jury to consider with special care and weigh with caution the testimony of [the witness]. Moreover, the issue of [the witness's] addiction was explored extensively during testimony.

692 F.2d at 661; *see also Cook*, 949 F.2d at 295 ("[T]he failure to give the addict instruction proffered by [the defendant] was not reversible error. The drug abuse . . . was revealed to the jury, and the district court gave a general credibility instruction alerting the jury to the potential for untrue testimony to gain personal advantage. The jury was therefore alerted to the possible weaknesses of the testimony in question." (citation omitted)).

20

Here, the jury instructions as a whole sufficiently alerted the jury to be wary of Mr. Thomas's testimony. As in *Smith*, the district court provided the jury with a general credibility instruction, an impeachment instruction, a prior conviction instruction, and an accomplice—co-defendant—plea agreement instruction. The accomplice instruction specifically warned the jury to "receive this type of testimony with caution and weigh it with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt."

Moreover, all parties questioned Mr. Thomas extensively about his prior drug use. Mr. Thomas testified that he joined the Bloods gang and started doing PCP and marijuana at ten years old, and since that time, has smoked PCP on a daily basis. Mr. Thomas testified that he and Mr. Grant were "getting high the whole time" they were in Oklahoma. And Mr. Grant testified that they smoked PCP at least seven times per day during that time. Mr. Gabourel's counsel asked Mr. Thomas several questions about his recollections of the events surrounding the conspiracy, emphasizing that Mr. Thomas's memory may have been clouded by his extensive drug use.

Together, the cautionary jury instructions and the examination and cross-examination of the witnesses sufficiently warned the jury of Mr. Thomas's drug addiction and the impact of that dependency on his credibility. Further, Mr. Gabourel points to no precedent from this circuit or the Supreme Court mandating a drug-addict instruction when not requested by the defense.[9] And even where the defense has specifically

---

[9] Fifty years ago, in *United States v. Griffin*, the Sixth Circuit found plain error where the district court failed to give a drug-addict instruction, but its holding relied in

21

requested such an instruction, we have held the district court did not abuse its discretion in failing to include the instruction where the instructions as a whole adequately instructed the jury. *See United States v. Barrett*, 797 F.3d 1207, 1219 (10th Cir. 2015); *United States v. Nicholson*, 983 F.2d 983, 991–92 (10th Cir. 1993); *Cook*, 949 F.2d at 295; *Smith*, 692 F.2d at 661. Thus, we cannot conclude the failure to provide an addict instruction is an obvious or clear error, or contrary to well-settled law.

### III. CASE NO. 16-6228, MR. GRANT'S APPEAL

On appeal, Mr. Grant contends the evidence was insufficient to support his convictions. Mr. Grant also claims the district court abused its discretion in admitting evidence of his prior convictions and his gang affiliation.

### A. *Sufficiency of the Evidence*

Mr. Grant contends there is insufficient evidence to support the jury's verdict of guilty on (1) conspiracy to possess with intent to distribute and to distribute PCP, (2) distribution of PCP (or aiding and abetting), and (3) possession of PCP with intent to distribute (or aiding and abetting). We discuss each issue in turn, and conclude the evidence is sufficient to support the convictions.

### 1. Count 1: Conspiracy to Possess with Intent to Distribute and to Distribute PCP

To convict Mr. Grant of conspiracy, the government was required to prove beyond a reasonable doubt that: (1) two or more persons agreed to distribute, or possessed with intent to distribute, PCP; (2) Mr. Grant "knew the essential objectives of the conspiracy";

---

part on the district court's failure to provide the jury with *any other* cautionary instructions. 382 F.2d 823, 828–29 (6th Cir. 1967).

(3) Mr. Grant "knowingly and voluntarily became a part of the conspiracy"; (4) there was "interdependence among the members of the conspiracy"; and (5) the conspiracy involved at least one kilogram of a mixture containing a measurable amount of PCP. *See United States v. Patterson*, 713 F.3d 1237, 1245 (10th Cir. 2013).

Mr. Grant concedes there was a conspiracy involving at least one kilogram of a mixture containing PCP, as it is undisputed that Mr. Thomas and Mr. Norman agreed to distribute and did distribute PCP. Mr. Grant also admits to knowing the essential objectives of the conspiracy because he acknowledges he saw the PCP in the apartment and knew the others were planning to distribute it. And Mr. Grant admits there was interdependence between Mr. Thomas, Mr. Norman, and Mr. Gabourel.

Mr. Grant contests only the third element, claiming that other than his "mere presence, there was no evidence he was in on [the conspiracy]." As indicated, he acknowledges he saw the PCP in the apartment and knew the others were planning to distribute it, but contends he did not "knowingly and voluntarily" enter into the conspiracy. Mr. Grant claims he told Mr. Thomas not to sell PCP in Oklahoma City and that he did not know until a minute before arriving at Walmart that Mr. Thomas and Mr. Norman were going there to sell PCP. Mr. Grant further claims he stole the bottle of PCP from the kitchen for his personal use, and during the arrest he hid it in his buttocks to avoid detection.

It is true that "mere presence is not sufficient in and of itself to establish a conspiracy, nor is it sufficient for the government to show only mere association with conspirators known to be involved in crime." *United States v. Caldwell*, 589 F.3d 1323,

23

1331 (10th Cir. 2009) (alteration and internal quotation marks omitted). But the jury was free to reject Mr. Grant's "mere presence" argument based on the government's evidence of Mr. Grant's involvement in the conspiracy. That evidence showed: Mr. Grant lived in Oklahoma prior to the conspiracy, he smoked some of the PCP that the group later sold, he was eating dinner with the other conspirators when Mr. Thomas arranged the drug sale, he knew about the drug deal before it occurred and did not leave, he was found with a vanilla extract bottle of PCP that matched the bottles sold to the informant, and this bottle contained a quantity of PCP fit for distribution, not personal use. Nor was the jury required to believe Mr. Grant's testimony that he would not have been in the stash house at all if he had known the gallon-sized container of PCP was there, and that once he saw it on the kitchen counter he decided never to return. Instead, the jury could weigh this testimony against the evidence that the odor of PCP in the apartment was overpowering and that Mr. Grant left his wallet with his social security card and birth certificate in the bedroom, indicating he planned to return. Further, Mr. Thomas testified that Mr. Grant would have helped him protect Mr. Norman if the drug deal had gone bad.

"It is the right of the jury to determine the credibility of each witness, and a jury may convict based on the uncorroborated testimony of a co-conspirator." *United States v. Thomas*, 749 F.3d 1302, 1314 (10th Cir. 2014) (internal quotation marks omitted). To be guilty of conspiracy, the government is not required to show that Mr. Grant "played a major role in the conspiracy" or even that Mr. Grant possessed the drugs. *United States v. Anaya*, 727 F.3d 1043, 1050 (10th Cir. 2013). Instead, his "participation in or connection to the conspiracy need only be slight, so long as sufficient evidence exists to establish

24

[Mr. Grant's] participation beyond a reasonable doubt." *United States v. Johnston*, 146 F.3d 785, 789 (10th Cir. 1998).

Applying these principles here, we affirm Mr. Grant's conspiracy conviction. Indeed, Mr. Grant never disputes the above facts, including Mr. Thomas's testimony that Mr. Grant would have assisted if the drug deal had gone bad. He instead challenges the jury's findings based on this evidence. But the jury could reasonably infer that Mr. Grant carried the third bottle, not for personal use, but for sale. The jury could also reasonably infer Mr. Grant was not simply in the wrong place at the wrong time, but a knowing participant in the conspiracy. We therefore agree with the district court that the evidence is sufficient to support the conviction for conspiracy to possess with intent to distribute and to distribute PCP.

## 2. Count 2: Distribution of PCP or Aiding and Abetting

To convict Mr. Grant under Count 2, the government needed to show that Mr. Grant knowingly or intentionally distributed a substance containing a measurable amount of PCP, or that he aided and abetted the distribution. *See* 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2. Mr. Grant argues the evidence was insufficient to convict him of distribution because he was "merely present" during the sale and was wrongfully "lumped in with the other culpable actors such that the jury's consideration of his personal involvement was compromised."

Although the government concedes that Mr. Grant did not personally distribute the PCP to the undercover officer, it contends he is liable nonetheless under a theory of coconspirator liability, or alternatively for aiding and abetting. We agree there was

25

sufficient evidence for the jury to convict Mr. Grant under either theory. *See United States v. Bowen*, 527 F.3d 1065, 1077 (10th Cir. 2008) ("Aiding and abetting and *Pinkerton* co-conspirator liability are alternative theories by which the Government may prove joint criminal liability for a substantive offense." (internal quotation marks omitted)).

In *Pinkerton v. United States*, the Supreme Court held that a conspirator may be liable for a substantive offense committed by other members of the conspiracy even when the conspirator did not directly participate in the commission of the offense. 328 U.S. 640, 645–46 (1946). Indeed, a "conspiracy participant is legally liable for all reasonably foreseeable acts of his or her coconspirators in furtherance of the conspiracy." *United States v. Brewer*, 983 F.2d 181, 185 (10th Cir. 1993); *see also United States v. Russell*, 963 F.2d 1320, 1322 (10th Cir. 1992) ("During the existence of a conspiracy, each member of the conspiracy is legally responsible for the crimes of fellow conspirators."). Here, distribution of PCP was not only a reasonably foreseeable act in furtherance of the conspiracy, but the entire objective and purpose of the conspiracy. Thus, the jury had sufficient evidence to convict Mr. Grant for the substantive offense of distribution under the theory of coconspirator liability.

In addition, Mr. Grant's conviction can be sustained under an aiding and abetting theory of liability. This theory "allows a jury to hold an aider and abetter responsible for the substantive offense to the same extent as a principal, even though his act was not the cause of the substantive harm." *Bowen*, 527 F.3d at 1078. Here, the jury instructions for aiding and abetting required the government to show that although someone else

26

distributed the PCP, Mr. Grant "intentionally associated himself in some way with the crime and intentionally participated in it as he would in something he wished to bring about." In other words, "the government must prove beyond a reasonable doubt that [Mr. Grant] consciously shared the other person's knowledge of the underlying criminal act and intended to help." The jury instructions did not require the government to show that Mr. Grant knew the details of the distribution or was present for the actual distribution.

Here, Mr. Grant rode in the car to the drug deal, and did not remove himself from the situation even when he knew the trip was for the purpose of selling PCP. Further, the jury was free to believe Mr. Thomas's testimony that if the buyers tried to jump Mr. Norman, Mr. Thomas and Mr. Grant probably "would have broke[n] it up." And it was reasonable for the jury to infer that Mr. Grant carried the third bottle of PCP not for his personal use but in case the informant wanted more, especially because the evidence included testimony from a police officer that the quantity of PCP in the bottle was greater than that associated with personal use. From this evidence, the jury could reasonably infer that Mr. Grant aided and abetted the drug transaction.

### 3. Count 3: Possession with Intent to Distribute or Aiding and Abetting

To convict Mr. Grant of possession with intent to distribute, the government needed to prove that he knowingly or intentionally possessed at least one kilogram of PCP with the intent to distribute it. *See United States v. Jacobs*, 579 F.3d 1198, 1200 (10th Cir. 2009). Possession may be actual or constructive. *See United States v. Avery*, 295 F.3d 1158, 1177 (10th Cir. 2002) ("Generally speaking, possession of contraband, whether it be drugs or a firearm, may be either actual or constructive." (internal quotation

marks omitted)). And as with Count 2, the government alternatively charged Mr. Grant with aiding and abetting.

Mr. Grant contends he actually "possessed a one-ounce McCormick vanilla extract bottle containing PCP for his personal use. There was no evidence—direct or circumstantial—that he intended to distribute it." The government makes four arguments for upholding Mr. Grant's conviction for possession: (1) actual possession, (2) constructive possession, (3) coconspirator liability for the substantive offense, and (4) aiding and abetting.

First, it is undisputed that Mr. Grant actually possessed a vanilla extract bottle containing one ounce of PCP. This bottle matched the two bottles sold to the informant and Mr. Grant admits it came from the stash at the apartment. A police officer also testified that the amount of PCP contained in the bottle found in Mr. Grant's physical possession was a distribution quantity. From this testimony and the evidence regarding Mr. Grant's prior convictions for possession of PCP with intent to distribute and for trafficking in PCP, the jury could reasonably infer Mr. Grant actually possessed the PCP and intended to distribute it.

Second, "[c]onstructive possession is established when a person, though lacking . . . physical custody, still has the power and intent to exercise control over the object." *Henderson v. United States*, 135 S. Ct. 1780, 1784 (2015).[10] Mr. Grant knew there was a

---

[10] This circuit in *United States v. Little* abrogated our prior precedent holding it was unnecessary to establish the defendant's *intent* to exercise dominion or control to show constructive possession. 829 F.3d 1177, 1181–82 (10th Cir. 2016). Both *Henderson* and *Little* involved firearm possession under 18 U.S.C. § 922(g) and not the drug statute

28

large amount of PCP at the stash house and admitted to smoking PCP from this batch. And he was caught with a bottle of PCP identical to those sold to the informant. The jury could reasonably infer that Mr. Grant had the power and intent to exercise control over the PCP in the stash house.

Third, as detailed above, a conspiracy member is liable for the substantive offenses committed by other members of the conspiracy committed "in furtherance of the unlawful agreement or conspiracy." *Pinkerton*, 328 U.S. at 645; *see also Russell*, 963 F.2d at 1322 ("During the existence of a conspiracy, each member of the conspiracy is legally responsible for the crimes of fellow conspirators."). The government contends that Mr. Grant "was an integral part of the conspiracy to possess and distribute PCP. Mr. Grant smoked the PCP and knew that a large amount of PCP was at the stash house. Mr. Grant also accompanied Mr. Norman and Mr. Thomas to the drug deal and provided protection for Mr. Norman." The jury could reasonably conclude Mr. Grant was liable for possession with intent to distribute under a theory of coconspirator liability.

Finally, the jury need only find Mr. Grant guilty of aiding and abetting, not the substantive crime itself. As discussed, the jury could reasonably find that Mr. Grant intentionally associated himself with the crime because he knew a large quantity of PCP was at the stash house, he smoked some of that PCP, he was aware Mr. Thomas and Mr. Norman intended to distribute it, and he was available to provide protection during the drug sale to the undercover officer.

---

at issue in this case (21 U.S.C. § 841), but the parties agree that this test would extend to constructive possession for violations of 21 U.S.C. § 841(a)(1).

There is sufficient evidence to support the jury's verdict under each of these alternative theories. We therefore affirm Mr. Grant's conviction for possession with intent to distribute.

## B. *Admission of Prior Convictions and Gang Affiliation*

Next, Mr. Grant appeals two of the district court's evidentiary rulings: (1) admission of evidence of his prior convictions and the facts surrounding those convictions, and (2) admission of evidence of his gang affiliation. We review the district court's evidentiary rulings for abuse of discretion. *United States v. Becker*, 230 F.3d 1224, 1228 (10th Cir. 2000). "Evidentiary rulings generally are committed to the very broad discretion of the trial judge, and they may constitute an abuse of discretion only if based on an erroneous conclusion of law, a clearly erroneous finding of fact or a manifest error in judgment." *Leprino Foods Co. v. Factory Mut. Ins. Co.*, 653 F.3d 1121, 1131 (10th Cir. 2011) (internal quotation marks omitted); *see also Rocky Mountain Christian Church v. Bd. of Cty. Comm'rs*, 613 F.3d 1229, 1239–40 (10th Cir. 2010) ("A district court abuses its discretion when it issues an arbitrary, capricious, whimsical, or manifestly unreasonable judgment" (internal quotation marks omitted)). We conclude the district court did not abuse its discretion in admitting evidence of Mr. Grant's prior convictions and gang affiliation.

## 1. Prior Convictions

The district court admitted evidence of Mr. Grant's Oklahoma and Nevada convictions for possession with intent to distribute and their underlying facts under Federal Rule of Evidence 404(b). Rule 404(b) provides that "evidence of a prior crime,

30

wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). "Rule 404(b) is considered to be an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Burgess*, 576 F.3d 1078, 1098 (10th Cir. 2009) (internal quotation marks omitted). The government bears the burden to show "the proffered evidence is relevant to an issue other than character." *United States v. Youts*, 229 F.3d 1312, 1317 (10th Cir. 2000).

Here, the district court admitted evidence of Mr. Grant's prior convictions under Rule 404(b) to show intent, knowledge, and lack of accident or mistake. In reviewing this decision on appeal, we must determine whether: (1) the evidence was offered for a proper purpose; (2) the evidence is relevant; (3) the probative value of the evidence is not substantially outweighed by the potential for unfair prejudice; and (4) the district court, if requested, gave an appropriate limiting instruction. *United States v. Watson*, 766 F.3d 1219, 1236 (10th Cir. 2014).[11] Mr. Grant does not dispute that the district court provided a limiting instruction but contends the first three requirements were not met.

---

[11] Because we conclude that the evidence was properly admitted under Rule 404(b), we need not consider whether the prior convictions were "inextricably intertwined" with evidence of the charged crime. *United States v. Watson*, 766 F.3d 1219, 1235 (10th Cir. 2014).

*a. Proper Purpose*

First, Mr. Grant argues the government sought to admit his prior convictions to "show conformity and to inflame the jury," rather than for a proper purpose. But "[o]ur court has time and again held that past drug-related activity is admissible other-acts evidence under Rule 404(b) to prove, *inter alia*, that the defendant had the knowledge or intent necessary to commit the crimes charged." *Watson*, 766 F.3d at 1237 (collecting cases).

Here, the district court concluded that the "question of whether Mr. Grant had the requisite intent to distribute the PCP found in his possession will be a primary issue in the trial." The government contends that Mr. Grant's intent became a "central issue" in this case after he claimed he was "simply a user of PCP and not part of a conspiracy to possess PCP with the intent to distribute it." The court also admitted the evidence so the government could show Mr. Grant "knew how to possess and distribute large quantities of PCP . . . [and] was not just in the wrong place at the wrong time when he was arrested." Further, the court found the prior convictions evidence would "establish [Mr. Grant's] knowledge of how to accomplish the alleged PCP trafficking conspiracy in this case." We agree with the district court that the evidence was offered for a proper purpose.

*b. Relevancy*

Second, Mr. Grant contends the evidence of his prior convictions was not relevant—but he fails to make any argument as to *why*. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). "[W]e have noted that prior narcotics involvement is relevant when

that conduct is close in time, highly probative, and similar to the activity with which the defendant is charged." *Becker*, 230 F.3d at 1232 (internal quotation marks omitted). Here, the government introduced evidence of two of Mr. Grant's past convictions, both of which were close in time and similar to the activity with which Mr. Grant was charged here. These prior convictions occurred in 2013 and 2014. In the 2013 case, Mr. Grant pled guilty in Oklahoma to possession with intent to distribute PCP. In the 2014 case, Mr. Grant pled guilty in Nevada to possession of cocaine and/or marijuana with intent to distribute, but he was charged with trafficking in PCP.[12] This evidence was "highly probative" to refute Mr. Grant's claim that he was not involved in the present conspiracy beyond the one ounce he had on his person at the time of the arrest, which he asserted was for personal use. "[W]e would have difficulty concluding that this other-acts evidence did not have *any* tendency to make a fact of consequence, in the form of Mr. [Grant's] knowledge and intent, more probable." *Watson*, 766 F.3d at 1241. We agree with the district court that the evidence of the prior convictions was relevant.

### c. *Unfair Prejudice*

Third, Mr. Grant claims the evidence was "grossly prejudicial" and "impinged significantly on [his] substantial rights" in violation of Federal Rule of Evidence 403. He contends the "public's negative attitudes toward illegal drugs in combination with Mr. Grant's two prior convictions in the last couple of years likely inflamed the emotions of jurors to convict."

---

[12] The police in that case found PCP in the toilet of the residence from which Mr. Grant had fled prior to his arrest.

Rule 403 provides that a "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. We have described the litigant's burden in demonstrating a district court abused its discretion when conducting a Rule 403 analysis as "onerous," because "our law favors admission of all relevant evidence not otherwise proscribed; thus, exclusion under this rule is an extraordinary remedy that should be used sparingly." *Watson*, 766 F.3d at 1241 (alteration and internal quotation marks omitted); *see also id.* (granting district courts "considerable discretion" because "district court judges have front-row seats during trial and extensive experience ruling on evidentiary issues" (internal quotation marks omitted)).

"In determining whether evidence is properly admitted under Rule 403, we consider (1) whether the evidence was relevant, (2) whether it had the potential to *unfairly* prejudice the defendant, and (3) whether its probative value was substantially outweighed by the danger of unfair prejudice." *Id.* (internal quotation marks omitted). As explained above, the evidence of Mr. Grant's prior convictions was relevant and highly probative. Thus, the remaining question is whether the evidence presented a danger of being unfairly prejudicial.

The district court recognized that introducing evidence of Mr. Grant's prior convictions was "obviously prejudicial," but concluded the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice. *See United States v. Tan*, 254 F.3d 1204, 1212 (10th Cir. 2001) ("Even if . . . prejudice is found, it

34

must *substantially* outweigh the probative value of the evidence in order to be excluded under Rule 403."); *United States v. Archuleta*, 737 F.3d 1287, 1293 (10th Cir. 2013) ("Virtually all relevant evidence is prejudicial to one side or the other."). In assessing whether the evidence of his prior convictions was unfairly prejudicial, we consider whether it will "cause the jury to decide the instant case against [Mr. Grant] on an improper emotional basis." *United States v. McGlothin*, 705 F.3d 1254, 1266 (10th Cir. 2013).

Here, we cannot conclude the admission of the prior convictions evidence caused the jury to decide the case against Mr. Grant on an improper basis. Instead, the evidence was highly probative because of its similarity to the present charges and its closeness in time. And because of the "similarity of the circumstances between [Mr. Grant's] prior drug-related arrests and the incident for which he was convicted, . . . any potentially prejudicial impact had to be *extremely heavy*, in order for the district court to have deemed the evidence inadmissible under Rule 403." *United States v. Conway*, 73 F.3d 975, 981 (10th Cir. 1995) (emphasis added). Mr. Grant has failed to show the district court abused its wide discretion in admitting this evidence.

## 2.  Gang Affiliation

The government moved in limine to admit evidence of all four conspirators' gang affiliation. The district court reserved ruling on the admissibility of the gang affiliation evidence until the trial. Before Mr. Thomas testified, the court allowed the evidence, limiting the government to questions about Mr. Thomas's gang affiliation, but allowing Mr. Gabourel's counsel to question Mr. Thomas about Mr. Grant's affiliation as well.

Because the government did not solicit any evidence on Mr. Grant's gang affiliation, the court did not employ a Rule 404(b) analysis.

On appeal, Mr. Grant contends the district court abused its discretion in allowing Mr. Gabourel's counsel to ask Mr. Thomas questions about Mr. Grant's gang affiliation. Mr. Grant does not contend the court erred in forgoing a Rule 404(b) analysis; thus, we determine only whether the evidence was relevant under Rule 401 and not unfairly prejudicial under Rule 403.

Mr. Grant acknowledges that the information was relevant to Mr. Gabourel's defense, but contends that, as to himself, "the evidence was not relevant and its probative value was outweighed by the danger of unfair prejudice." He asserts that "the alleged gang affiliation evidence only impugned Mr. Grant's character in general," and "the district court should have severed Gabourel's trial from that of Mr. Grant."

Mr. Grant's argument ignores the conspiracy charges against him. We have held that gang-affiliation evidence may be relevant where conspiracy is charged. *See, e.g.*, *Archuleta*, 737 F.3d at 1294–95 (collecting cases). This evidence is probative of the formation of the conspiracy, the coconspirators' agreement, and the purpose of the conspiracy. *United States v. Robinson*, 978 F.2d 1554, 1562–64 (10th Cir. 1992); *see also United States v. Sloan*, 65 F.3d 149, 151 (10th Cir. 1995) (affirming admission of "gang activity" evidence "to prove the existence of a conspiracy and to show the basis of the relationship between the defendant and witnesses who participated in the drug distribution operation"). Thus, the evidence would have been relevant whether Mr. Grant was tried with Mr. Gabourel, or in a separate trial.

The only remaining question, then, is whether the admission of the gang affiliation evidence presented a danger of unfair prejudice to Mr. Grant. We conclude it did not. First, there was sufficient evidence to convict Mr. Grant without evidence of his gang affiliation. The government asserts "it is distinctly improbable that the omission of this gang affiliation would have led the jurors to ignore the evidence against Mr. Grant, including his presence at the PCP deal and the . . . bottle of PCP found on Mr. Grant." We agree. As discussed, Mr. Grant stayed in the stash house that smelled strongly of PCP, despite the lack of furniture or electricity. He used PCP from the stash and carried an extra bottle of PCP to the drug transaction, where he was available as protection during the sale. The fact of Mr. Grant's gang affiliation, while relevant, was unlikely to have been critical to his conviction.

Second, Mr. Grant had a visible "A" and "P" tattooed on his face, which he did not try to conceal during trial. As the government contends, this "could reasonably be seen by the jury to consistently and openly proclaim his membership in the Athens Park Bloods street gang." And some of the witnesses, when asked to identify Mr. Grant, did so by reference to his facial tattoos. Thus, even if the district court had erred in admitting the evidence, any error was likely harmless because Mr. Grant's gang affiliation was obvious upon inspection. Under these circumstances, we cannot conclude Mr. Grant was unfairly prejudiced by the district court's admission of the highly probative gang affiliation evidence.

## IV.  CONCLUSION

Mr. Gabourel has failed to show that no rational juror could have convicted him of conspiracy to possess with intent to distribute PCP, possession with intent to distribute PCP, and possession of a firearm in furtherance of a drug crime. Further, the district court did not commit plain error in failing to sua sponte include a drug-addict instruction when the jury received several other cautionary instructions and all parties extensively questioned Mr. Thomas regarding his drug use. We therefore affirm his convictions.

Mr. Grant has also failed to show that no rational juror could have convicted him of conspiracy to possess with intent to distribute PCP, distribution of PCP, and possession with intent to distribute PCP. In addition, the district court did not abuse its discretion in admitting evidence of his prior convictions and gang affiliation. We therefore affirm his convictions.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

38